2003 ND 79

**Monte L. HOFFNER and Kris Hoffner, Plaintiffs and Appellants**

v.

**George M. JOHNSON, M.D. and Fargo Clinic/MeritCare, Defendants and Appellees.**

No. 20020208.

Supreme Court of North Dakota.

May 12, 2003.

Lee R. Bissonette (argued), Lambert & Bissonette, Wayzata, MN, Scott K. Porsborg (appeared), Smith Bakke Oppegard Porsborg Wolf, Bismarck, and Daniel L. Hovland (on brief), for plaintiffs and appellants.

Angela Elsperger Lord (argued) and Jane C. Voglewede (on brief), Vogel Law Firm, Fargo, for defendants and appellees.

VANDE WALLE, Chief Justice.

[¶ 1]   Monte and Kris Hoffner appealed from a judgment dismissing their claims against Dr. George M. Johnson and Fargo Clinic/MeritCare. We affirm, concluding the six-year statute of repose for medical malpractice is constitutional and bars the claims in this action.

I

[¶ 2]   In 1988, Dr. Johnson diagnosed fourteen-year-old Monte Hoffner with Type I diabetes. Monte was hospitalized for a time and, upon discharge, continued receiving treatment for his diabetes. In 1992, Monte again saw Dr. Johnson and underwent additional testing. On May 28, 1992, Dr. Johnson advised Monte in a letter that his diabetes had been cured and Monte did not need to do routine blood sugar testing:

> Monte, I feel strongly you have had in the past Type II diabetes, rather than

Type I diabetes. You have never had ketones in your urine or diabetic ketoacidosis. . . .

All this means that you have "lost" your diabetes because you lost a lot of weight following your original diagnosis in 1988. The stability of blood sugars and the very small doses of insulin ever since 1988 suggest you have a very unusual circumstance, Type II diabetes of youth (which in itself is rare) followed by "cure" of diabetes because you lost weight and have maintained a high activity level.

You should not need to do blood sugars in the future unless you start to gain a lot of weight. Please be advised when you grow older that diabetes can "return" if you are not careful about what you eat and you gain weight.

Insofar as I am concerned, there is absolutely no reason for insurance programs to cause difficulty for you during enrollment. Again, you have "lost" your Type II diabetes mellitus.

Dr. Johnson did not treat Monte or have any further contact with him after the 1992 letter.

[¶ 3] In December 1999, Monte experienced flu-like symptoms and weight loss. Doctors discovered Monte was still diabetic and recommenced insulin treatments. Monte suffered numerous complications allegedly caused by his untreated diabetes, including loss of vision in both eyes, peripheral neuropathy, cancer, and a pancreas transplant. Monte died on January 4, 2002, at the age of 27.

[¶ 4] On November 20, 2001, shortly before Monte died, he and his wife Kris brought this medical malpractice action against Dr. Johnson and Fargo Clinic/MeritCare. Dr. Johnson and Fargo Clinic/MeritCare (collectively "Johnson") moved for summary judgment under the six-year statute of repose for medical malpractice actions in N.D.C.C. § 28–01–18(3). On June 7, 2002, the court granted Johnson's motion for summary judgment. Judgment dismissing the action was entered on June 25, 2002, and the Hoffners appealed.[1]

II

[¶ 5] Summary judgment is a procedural device for promptly and expeditiously disposing of an action without a trial if either party is entitled to judgment as a matter of law and no dispute exists as to either the material facts or the reasonable inferences to be drawn from undisputed facts, or if resolving the factual disputes will not alter the result. *Jundt v. Jurassic*

---

1. Monte Hoffner died while the action was pending in district court. Although a copy of his death certificate was entered in the record, the parties failed to move for substitution of his estate as a party under N.D.R.Civ.P. 25(a). After we raised the issue during oral argument, Kris Hoffner filed a written motion seeking substitution of Monte's estate as a party under N.D.R.App.P. 43(a). Johnson responded with a motion to dismiss because Kris Hoffner had failed to move for substitution of a party within ninety days after the death was suggested upon the record, as required by N.D.R.Civ.P. 25(a)(1).

We deny Kris's motion to substitute the estate under N.D.R.App.P. 43(a). By its terms, the rule allows substitution "[i]f a party dies after a notice of appeal is filed or while a proceeding is otherwise pending in the supreme court." The intent of the rule is to provide a mechanism for substitution for a party who dies after the proceedings in the district court have concluded.

We need not reach Johnson's motion to dismiss the appeal. Even if we were to dismiss Monte Hoffner's claims for failure to properly substitute a party under N.D.R.Civ.P. 25(a), Kris Hoffner's claims would remain and need to be addressed. Because we conclude Kris Hoffner's claims are barred by the statute of repose, and Monte Hoffner's claims would of necessity also be barred, it is unnecessary to resolve Johnson's motion to dismiss.

*Res. Dev.*, 2003 ND 9, ¶ 23, 656 N.W.2d 15; *Hilton v. North Dakota Educ. Ass'n,* 2002 ND 209, ¶ 23, 655 N.W.2d 60. The evidence must be viewed in the light most favorable to the party opposing the motion, and that party will be given the benefit of all favorable inferences which can reasonably be drawn from the evidence. *Abel v. Allen,* 2002 ND 147, ¶ 8, 651 N.W.2d 635; *Mr. G's Turtle Mountain Lodge, Inc. v. Roland Township,* 2002 ND 140, ¶ 21, 651 N.W.2d 625. Whether the district court properly granted summary judgment is a question of law which we review de novo on the entire record. *Kondrad v. Bismarck Park Dist.,* 2003 ND 4, ¶ 4, 655 N.W.2d 411; *Duemeland v. Norback,* 2003 ND 1, ¶ 8, 655 N.W.2d 76.

### III

[¶ 6] The district court granted summary judgment based upon the six-year statute of repose found in N.D.C.C. § 28–01–18(3), which provides in part:

> 28–01–18. Actions having two-year limitations. The following actions must be commenced within two years after the claim for relief has accrued:
>
> . . . .
>
> 3. An action for the recovery of damages resulting from malpractice; provided, however, that the limitation of an action against a physician or licensed hospital will not be extended beyond six years of the act or omission of alleged malpractice by a nondiscovery thereof unless discovery was prevented by the fraudulent conduct of the physician or licensed hospital.

[¶ 7] The "act or omission of alleged malpractice" relied upon by Hoffner is the May 28, 1992, letter from Dr. Johnson informing Monte his diabetes had been cured and he did not need to regularly monitor his blood sugar. Because Hoffner did not commence this action until 9½

years after the letter, the district court concluded the action was barred by N.D.C.C. § 28–01–18(3). The court rejected Hoffner's argument that the six-year statute of repose was unconstitutional. On appeal, Hoffner argues the six-year statute of repose violates the equal protection clause.

### A

[¶ 8] All regularly enacted statutes carry a strong presumption of constitutionality, which is conclusive unless the party challenging the statute clearly demonstrates that it contravenes the state or federal constitution. *Grand Forks Prof'l Baseball, Inc. v. North Dakota Workers Comp. Bureau,* 2002 ND 204, ¶ 17, 654 N.W.2d 426; *Olson v. Bismarck Parks & Recreation Dist.,* 2002 ND 61, ¶ 11, 642 N.W.2d 864. Any doubt about a statute's constitutionality must, where possible, be resolved in favor of its validity. *State v. Burr,* 1999 ND 143, ¶ 9, 598 N.W.2d 147. Whether a statute is unconstitutional is a question of law, which is fully reviewable on appeal. *Id.*

### B

[¶ 9] In reviewing the constitutionality of N.D.C.C. § 28–01–18(3), we must first resolve a dispute whether the six-year period under the statute is a statute of limitation or a statute of repose. We distinguished the two in *Hanson v. Williams County,* 389 N.W.2d 319, 321 (N.D.1986) (citations omitted):

> Statutes of repose are different from statutes of limitation, although they have comparable effects. A statute of limitation bars a right of action unless it is filed within a specified period of time after an injury occurs. The purpose of a statute of limitation is to prevent "plaintiffs from sleeping on their legal rights to the detriment of defendants". Dick-

son, *The Statute of Limitations in North Dakota's Products Liability Act: An Exercise in Futility?*, 59 N.D. L.Rev. 551, 556 (1983); *State v. Halverson*, 69 N.D. 225, 226, 285 N.W. 292, 293 (1939). A statute of limitation period commences either upon the occurrence of an injury, or when the injury is discovered. A statute of limitation must allow a reasonable time after a cause of action arises for the filing of a lawsuit.

A statute of repose terminates any right of action after a specific time has elapsed, regardless of whether or not there has as yet been an injury. A statute of repose period begins to run from the occurrence of some event other than the event of an injury that gives rise to a cause of action and, therefore, bars a cause of action before the injury occurs. A person injured after the statutory period of repose is left without a remedy for the injury.

[¶ 10] The first portion of N.D.C.C. § 28–01–18(3) is a statute of limitation, providing that an action for malpractice must be commenced within two years. The two-year limitation period for malpractice actions is subject to the discovery rule, and the two years begins to run only when the plaintiff knows, or with reasonable diligence should know, of the injury, its cause, and the defendant's possible negligence. *Schanilec v. Grand Forks Clinic, Ltd.*, 1999 ND 165, ¶ 12, 599 N.W.2d 253; *Zettel v. Licht*, 518 N.W.2d 214, 215 (N.D.1994).

[¶ 11] The second part of the statute provides that, in medical malpractice cases only, no cause of action may be brought after six years from the act or omission of alleged malpractice. This part of the statute is a statute of repose. It does not commence from the time of injury, but from the date of the alleged negligent act. Although we have recognized that a medical malpractice action will *generally* accrue on the date of the alleged negligent act or omission, *see Schanilec*, 1999 ND 165, ¶ 11, 599 N.W.2d 253, that is not always the case. The occurrence of the negligent act and the injury to the plaintiff will not always be concurrent, and in such cases the cause of action does not accrue until the injury has occurred and manifested itself. This case is just such an example. The gravamen of Hoffner's argument is that Johnson misdiagnosed Monte's diabetes and told him he did not need to monitor his blood sugar in the future. It is unknown whether the "injury" to Monte occurred one week, one year, or more than six years after Johnson's letter, because we do not know when regular blood sugar monitoring would have indicated Monte needed to go back on insulin or have other treatment. Monte certainly could not have brought a medical malpractice action immediately after Johnson's letter, because at that point he had not suffered a compensable injury and damages caused by the alleged negligence.

[¶ 12] Courts in other jurisdictions construing similar statutes have held that the second portion of the statute, barring an action after a set period of years from the alleged negligent act or omission, constitutes a statute of repose. *See, e.g., Siler v. Block*, 204 Ga.App. 672, 420 S.E.2d 306, 307 (1992); *Ferrara v. Wall*, 323 Ill.App.3d 751, 257 Ill.Dec. 553, 753 N.E.2d 1179, 1181 (2001); *Sills v. Oakland Gen. Hosp.*, 220 Mich.App. 303, 559 N.W.2d 348, 351–52 (1996); *Garcia ex rel. Garcia v. LaFarge*, 119 N.M. 532, 893 P.2d 428, 433 (1995); *see also* Robert W. George, Comment, *Prognosis Questionable: An Examination of the Constitutional Health of the Arkansas Medical Malpractice Statute of Repose*, 50 Ark. L.Rev. 691, 696 (1998); Patrick E. Sullivan, Note, *Medical Malpractice Statute of Repose: An Unconstitutional Deni-*

*al of Access to the Courts,* 63 Neb. L.Rev. 150, 153–54 (1984); Christopher J. Trombetta, Note, *The Unconstitutionality of Medical Malpractice Statutes of Repose: Judicial Conscience Versus Legislative Will,* 34 Vill. L.Rev. 397, 400–01 (1989).

[¶ 13] Because the six-year period under N.D.C.C. § 28–01–18(3) begins to run upon the negligent act or omission, and not from the date of injury, it is a statute of repose. *See Hanson,* 389 N.W.2d at 321.

**C**

[¶ 14] Hoffner argues the six-year statute of repose of N.D.C.C. § 28–01–18(3) violates the equal protection clause because it creates an unconstitutional classification by allowing claims by medical malpractice plaintiffs whose injuries were discoverable within six years of the negligent act or omission but barring claims by plaintiffs whose injuries do not occur or manifest themselves within six years.

[¶ 15] In addressing equal protection challenges to statutes of repose, we have recognized that the right to recover for personal injuries is an important substantive right. *Dickie v. Farmers Union Oil Co. of LaMoure,* 2000 ND 111, ¶ 5, 611 N.W.2d 168; *Bellemare v. Gateway Builders, Inc.,* 420 N.W.2d 733, 736 (N.D. 1988); *Hanson v. Williams County,* 389 N.W.2d 319, 325 (N.D.1986). When a statute is challenged on equal protection grounds and an important substantive right is involved, we apply an intermediate standard of review requiring a close correspondence between the statutory classification and the legislative goals. *Olson,* 2002 ND 61, ¶ 11, 642 N.W.2d 864; *Dickie,* at ¶ 5; *Bellemare,* at 736; *Hanson,* at 323. In assessing statutory classifications under an equal protection analysis, we may consider unarticulated, as well as articulated, legislative purposes and goals. *See State v. Leppert,* 2003 ND 15, ¶ 18, 656 N.W.2d 718; *Olson,* at ¶ 11; *Haney v. North Dakota Workers Comp. Bureau,* 518 N.W.2d 195, 202 (N.D.1994); *Bellemare,* at 738.

[¶ 16] Hoffner contends the result in this case should be controlled by our decision in *Hanson,* in which this Court held the ten-year statute of repose for products liability actions violated equal protection. Johnson counters that this case is more like *Bellemare,* in which this Court upheld a statute of repose for actions brought against persons who designed, planned, or constructed improvements to real property.

[¶ 17] Hoffner argues that, as in the products liability statute of repose struck down in *Hanson,* the legislative history for the medical malpractice statute of repose indicates concerns with a perceived insurance crisis. The Court in *Hanson* concluded that, although there may have been an insurance crisis facing North Dakota products manufacturers, the legislature's chosen solution to that problem was questionable. *Hanson,* 389 N.W.2d at 328. Although the legislative history underlying the enactment of the medical malpractice statute of repose in 1975 is based in part upon concerns over availability and cost of malpractice insurance for North Dakota physicians, there are important distinctions between this case and *Hanson.* When the legislature enacted the products liability statute of repose, the State Insurance Commissioner opposed the bill and specifically testified that the statute of repose would not alleviate the problem of increasing insurance premiums for manufacturers in the state. *Hanson,* at 329 (Levine, J., specially concurring). By contrast, the Insurance Commissioner supported enactment of the medical malpractice statute of repose, testifying that there was a crisis situation, that insurers were discontinuing writing malpractice cover-

age, that claims paid were exceeding premiums collected, and that new doctors were unable to purchase malpractice insurance. *See Hearing on S.B. 2348 Before the Senate Judiciary Comm.*, 44th N.D. Legis. Sess. (Feb. 5, 1975) (testimony of J.O. Wigen, North Dakota Insurance Commissioner); *Hearing on S.B. 2348 Before the House Judiciary Comm.*, 44th .N.D. Legis Sess. (March 4, 1975) (testimony of J.O. Wigen, North Dakota Insurance Commissioner) *["House Hearing on S.B. 2348"]*. Other testimony on Senate Bill 2348 indicated a period of repose was needed to set a time beyond which claims could not be made because "evidence becomes more scattered," and most malpractice claims would be discovered within the period of repose. *See House Hearing on S.B. 2348* (testimony of Rep. Kretschmar).

[¶ 18] There are also similarities between the legislative goals for the statute of repose upheld in *Bellemare* and the medical malpractice statute of repose at issue in this case. In upholding the statute of repose for designers and constructors of improvements to real property, the Court in *Bellemare* stressed the potential for virtually unlimited liability for such defendants:

> [I]t appears that the Legislature's intention was simply to limit what would otherwise be virtually unlimited and perpetual exposure to liability for persons engaged in the "design, planning, supervision or observation of construction or construction" of improvements to real property without eliminating liability entirely by affording a reasonable period within which defects might be manifested and suits brought for injuries caused by defects.
>
> . . . .
>
> Here, we discern no illegal purpose in the goal of obtaining finality resulting in financial security and peace of mind by

restricting what would otherwise by virtually unlimited and perpetual exposure to persons engaged in the design, planning, supervision, and observation of construction, or construction of improvements to real property.

*Bellemare*, 420 N.W.2d at 737–38.

[¶ 19] In contrast to *Hanson*, which involved liability for defective products which normally have a limited useful life, the Court in *Bellemare* stressed the longer useful life of improvements to real property:

> "Since construction projects generally have expected useful lives of many years or decades, the possibilities for long-term liability for the professional architect or design engineer are enormous."

*Bellemare*, 420 N.W.2d at 737 (quoting *Yarbro v. Hilton Hotels Corp.*, 655 P.2d 822, 825 (Colo.1982)). The Court concluded that it was the legislature's judgment that construction or design defects are likely to be discovered within a reasonable period after completion of the improvement, and the legislature had fixed the period at ten years. *Bellemare*, at 737. Accordingly, the Court concluded there was a close correspondence between the statutory classification and the legislative goals. *Id.*

[¶ 20] Like the designers and constructors of improvements to real property, physicians could be subject to virtually unlimited liability without the statute of repose. Just as a construction project may stand for "years or decades," a person may live for years or decades before an act of medical malpractice manifests itself, raising the possibility of "long-term liability" for the physician or hospital. *See Bellemare*, 420 N.W.2d at 737.

[¶ 21] We also note that the majority of courts which have addressed this issue have upheld similar medical malpractice

statutes of repose challenged on equal protection grounds. *See, e.g., Brubaker v. Cavanaugh,* 741 F.2d 318, 321–22 (10th Cir.1984) (applying Kansas statute); *Jewson v. Mayo Clinic,* 691 F.2d 405, 411 (8th Cir.1982) (applying Minnesota statute); *Golden v. Johnson Mem'l Hosp., Inc.,* 66 Conn.App. 518, 785 A.2d 234, 246–48 (2001); *Craven v. Lowndes County Hosp. Auth.,* 263 Ga. 657, 437 S.E.2d 308, 309–10 (1993); *Valentine v. Thomas,* 433 So.2d 289, 292–93 (La.Ct.App.1983); *Sills v. Oakland Gen. Hosp.,* 220 Mich.App. 303, 559 N.W.2d 348, 353 (1996); *Cummings v. X–Ray Assocs. of New Mexico, P.C.,* 121 N.M. 821, 918 P.2d 1321, 1331–33 (1996); *Hoffman v. Powell,* 298 S.C. 338, 380 S.E.2d 821, 822 (1989); *Burris v. Ikard,* 798 S.W.2d 246, 249–50 (Tenn.Ct.App. 1990). *But see DeYoung v. Providence Med. Ctr.,* 136 Wash.2d 136, 960 P.2d 919, 924–26 (1998) (applying the rational basis test in holding Washington's eight-year medical malpractice statute of repose violated the privileges and immunities clause of the state constitution). While we recognize that the cases upholding similar medical malpractice statutes of repose have employed a rational basis analysis when considering the constitutionality of their respective provisions, in many instances those jurisdictions do not recognize an intermediate standard of review for classifications involving an important substantive right, and the choice was therefore between only a rational basis standard and strict scrutiny. *See Golden,* at 247; *Craven,* at 310; *Valentine,* at 292.

[¶ 22] In upholding statutes of repose, courts have stressed the need to create a reasonable limit on the legal consequences of a wrong and the difficulty in proof of old claims:

> The statute of limitations and repose sections are a way of implementing the public policy of limiting the legal consequences of wrongs to a controllable degree. "There are two principal reasons generally given for the enactment of a statute of repose: (1) it reflects a policy of law, as declared by the legislature, that after a given length of time a [defendant] should be sheltered from liability and furthers the public policy of allowing people, after the lapse of a reasonable time, to plan their affairs with a degree of certainty, free from the disruptive burden of protracted and unknown potential liability ... and (2) to avoid the difficulty in proof and record keeping which suits involving older [claims] impose."

*Golden,* 785 A.2d at 241 (quoting *Sanborn v. Greenwald,* 39 Conn.App. 289, 664 A.2d 803, 811–12 (1995)).

[¶ 23] We conclude there is a close correspondence between the statutory classification and the legislative goals, and accordingly the six-year medical malpractice statute of repose of N.D.C.C. § 28–01–18(3) does not violate equal protection.

## IV

[¶ 24] Hoffner argues Johnson should be precluded from relying upon the six-year statute of repose under the doctrine of equitable estoppel.

[¶ 25] Equitable estoppel may operate to preclude application of statutes of limitation or repose as a defense by one who has misled another, thereby inducing that person to not file a claim within the statutory period. *See Snortland v. State,* 2000 ND 162, ¶ 15, 615 N.W.2d 574; *Narum v. Faxx Foods, Inc.,* 1999 ND 45, ¶ 24, 590 N.W.2d 454; *In re Estate of Helling,* 510 N.W.2d 595, 596–97 (N.D. 1994). The doctrine of equitable estoppel is codified at N.D.C.C. § 31–11–06, which provides:

> When a party, by that party's own declaration, act, or omission, intentional-

ly and deliberately has led another to believe a particular thing true and to act upon such belief, that party shall not be permitted to falsify it in any litigation arising out of such declaration, act, or omission.

See *Narum*, at ¶ 24; *American Ins. Co. v. Midwest Motor Express, Inc.*, 554 N.W.2d 182, 188 (N.D.1996); *Estate of Helling*, at 597; *Burr v. Trinity Med. Ctr.*, 492 N.W.2d 904, 908 (N.D.1992).

[¶ 26] To successfully implement the doctrine of equitable estoppel to preclude application of a statute of limitation or repose, the plaintiff has the burden of proving (1) the defendant made statements intending the plaintiff would rely on them; (2) the plaintiff in fact relied on them, and as a result failed to commence her action within the prescribed period; and (3) the statements were made prior to the expiration of the statutory period. *Narum*, 1999 ND 45, ¶ 24, 590 N.W.2d 454; *American Ins. Co.*, 554 N.W.2d at 188; *Burr*, 492 N.W.2d at 908. In addition, the defendant's conduct must amount to "some form of affirmative deception." *Narum*, at ¶ 24. As noted in *Krueger v. St. Joseph's Hosp.*, 305 N.W.2d 18, 25 (N.D.1981):

> Estoppel, in the context where it is urged as a defense to the statute of limitations, is concerned with the actions of one guilty of wrongdoing and operates to preclude the application of the statute of limitations as a defense by the wrongdoer.

[¶ 27] In support of her assertion of equitable estoppel, Hoffner relies solely upon Johnson's May 28, 1992, letter advising Monte that his diabetes had been cured and that he no longer needed to regularly monitor his blood sugar levels. In essence, Hoffner relies upon the very act she claims constituted malpractice to also equitably estop Johnson from asserting a defense under the statute of repose.

While Johnson's statements may arguably have constituted negligence, they do not constitute an affirmative deception intended to induce Hoffner to fail to timely commence a medical malpractice action. *See American Ins. Co.*, 554 N.W.2d at 188.

[¶ 28] Cases from other jurisdictions similarly conclude that the alleged underlying act of medical malpractice cannot also provide the basis for equitable estoppel to defeat a statute of limitations defense. *See Rowell v. McCue*, 188 Ga.App. 528, 373 S.E.2d 243, 245–46 (1988) (mere misdiagnosis insufficient to support equitable estoppel); *Dasha v. Maine Med. Ctr.*, 665 A.2d 993, 995 (Me.1995) (misdiagnosis insufficient to support equitable estoppel); *Duncan v. Augter*, 286 Or. 723, 596 P.2d 555, 560 (1979) (the treatment or operation whose failure provides the basis of the plaintiff's complaint cannot provide the basis for equitable estoppel). As noted by the court in *Duncan*, at 560, allowing a plaintiff to assert equitable estoppel based solely upon discovery of the allegedly unprofessional treatment would be a "bootstrap justification for a delayed claim."

[¶ 29] We conclude the district court did not err in concluding Johnson was not equitably estopped from asserting the defense of the statute of repose.

## V

[¶ 30] Hoffner urges this Court to adopt the continuous treatment rule and to hold that the statutes of limitation and repose under N.D.C.C. § 28–01–18(3) were tolled by a continuing course of treatment. This Court has never adopted the continuous treatment rule in medical malpractice cases. *See Schanilec v. Grand Forks Clinic Ltd.*, 1999 ND 165, ¶ 21, 599 N.W.2d 253. We need not determine whether to adopt the rule because we conclude that, were we to adopt the doctrine,

the rule would not apply under the undisputed facts in this case.

■ [¶ 31] The continuous treatment doctrine is premised upon an ongoing and continuous relationship between patient and physician. *Schanilec,* 1999 ND 165, ¶ 21, 599 N.W.2d 253; *Wheeler v. Schmid Labs., Inc.,* 451 N.W.2d 133, 138 (N.D. 1990); *Froysland v. Altenburg,* 439 N.W.2d 797, 799 (N.D.1989). We have explained the rationale for the rule:

> The reasons underlying the rule are that a patient must trust a physician to remain in his care and that during that care, the patient is not likely to suspect negligent treatment. It is the trust relationship that may make discovery of a claim difficult. The Minnesota Court of Appeals has summarized the appropriate factors for determining when treatment ends:
>
> > "(1) whether there is a relationship between physician and patient with regard to the illness; (2) whether the physician is attending and examining the patient; and (3) whether there is something more to be done."

*Wheeler,* at 138 (quoting *Krause v. Farber,* 379 N.W.2d 93, 96 (Minn.Ct.App.1985)).

■ [¶ 32] The continuing treatment doctrine requires an active physician-patient relationship, and is not triggered by actions such as the patient continuing on prescribed medications, return visits to merely check the patient's condition, or monitoring without additional treatment. *See Harlfinger v. Martin,* 435 Mass. 38, 754 N.E.2d 63, 75 (2001). Thus, we concluded that the rule did not apply when two years had passed since the patient had last been seen by the doctor. *Schanilec,* 1999 ND 165, ¶¶ 22–23, 599 N.W.2d 253. In *Wheeler,* this Court concluded the rule did not apply even though the patient·continued on medication prescribed by the doctor for eight years after her last personal contact with the doctor and had a subsequent routine examination by a nurse practitioner at the clinic. In *Froysland,* this Court held the rule did not apply where the anesthesiologist who allegedly had been negligent during a first surgery again participated in a second surgery more than two years later. The Court concluded that "continuous treatment anticipates something more than an isolated act of added attention by the physician more than two years after the initial conduct charged as injurious." *Froysland,* 439 N.W.2d at 800.

[¶ 33] In this case, more than 9½ years passed from the last contact between Dr. Johnson and Monte and commencement of this action. There were no follow-up visits, monitoring of Monte's condition, or other continuous treatment. In fact, their last contact, the May 1992 letter, clearly indicates that no further ongoing doctor-patient relationship was anticipated. The letter informed Monte that he had been cured and no further treatment or monitoring was necessary unless he gained weight. Dr. Johnson was no longer "attending and examining" Monte, and there was not "something more to be done." *Wheeler,* 451 N.W.2d at 138. If anything, this case represents the antithesis of continuing treatment.

[¶ 34] We conclude that, if the continuous treatment rule were adopted, it would not apply in this case to toll the statutes of limitation or repose.

## VI

[¶ 35] We have considered the remaining issues raised by Hoffner and find them to be without merit. The judgment is affirmed.

[¶ 36] DALE V. SANDSTROM, J., and ALLAN L. SCHMALENBERGER, District Judge, concur.

[¶ 37] The Honorable ALLAN L. SCHMALENBERGER, District Judge, sitting in place of KAPSNER, J., disqualified.

MARING, Justice, dissenting.

[¶ 38] I respectfully dissent. I also apply the intermediate standard of review, but I reach a different result. I conclude the diverse treatment of injured persons bears no close correspondence to any legislative goal and, therefore, violates the equal protection clause of the North Dakota Constitution. N.D. Const. art. I, § 21.

[¶ 39] The majority states: "In assessing statutory classifications under an equal protection analysis, we may consider unarticulated, as well as articulated, legislative purposes and goals." It cites to *State v. Leppert*, 2003 ND 15, ¶ 18, 656 N.W.2d 718; *Olson v. Bismarck Parks and Recreation Dist.*, 2002 ND 61, ¶ 11, 642 N.W.2d 864; *Haney v. North Dakota Workers Comp. Bureau*, 518 N.W.2d 195, 202 (N.D. 1994); *Bellemare v. Gateway Builders, Inc.*, 420 N.W.2d 733, 738 (N.D.1988). However, a reading of those cases reveals *Leppert* and *Haney* are cases in which we applied a rational-basis standard of review to a claim of denial of equal protection. *Leppert*, at ¶ 18; *Haney*, at 201. When we review an equal protection challenge using the rational-basis standard of review, we have said: "[I]t is not necessary that the Legislature have articulated the purpose or rationale supporting the classification, providing there is an identifiable purpose which the Legislature may have reasonably considered in adopting the classification." *Baldock v. North Dakota Workers Comp. Bureau*, 554 N.W.2d 441, 446 (N.D. 1996) (citing *NL Indus., Inc. v. North Dakota State Tax Comm'r*, 498 N.W.2d 141, 149 (N.D.1993)); *accord Haney*, at 202; *Leppert*, at ¶ 18; *State v. Knoefler*, 325 N.W.2d 192, 195 (N.D.1982). " 'The Equal Protection Clause does not demand for purposes of rational-basis review that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification.' " *NL Indus., Inc.*, at 149 (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 15–16, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992)). Thus, even when the statute and legislative history is silent, the Court can review if the purpose " 'may reasonably have been the purpose and policy' of the relevant governmental decisionmaker." *NL Indus., Inc.*, at 149 (quoting *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 528–29, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959)). Considering any conceivable purpose is part of the inquiry in the rational-basis standard of review, but not in the intermediate standard of review. For the proposition that any conceivable purpose can be used in an equal protection analysis under the intermediate standard of review, the majority opinion cites to two cases, *Olson*, 2002 ND 61, ¶ 11, 642 N.W.2d 864, and *Bellemare*, 420 N.W.2d at 738. Although *Olson* is a case in which we apply an intermediate standard of review, the cases cited for the proposition that we may consider unarticulated legislative purposes are both cases in which we apply the rational-basis standard of review. *See Olson*, at ¶ 11 (citing *Haney*, 518 N.W.2d at 202 and *Knoefler*, 325 N.W.2d at 195).

[¶ 40] In *Bellemare*, we cite to *Herman v. Magnuson*, 277 N.W.2d 445, 453–54 (N.D.1979), for the proposition that we can conceive legislative goals that are not stated in the statute or legislative history. *Bellemare*, 420 N.W.2d at 738. *Herman* and *Bellemare* are both authored by the author of this majority opinion. Again, although we purport in *Herman* to apply an intermediate standard of review, we find unstated legislative goals to uphold the constitutionality of the statute by citing to goals set forth in a Colorado decision and an Alabama decision, both of

which applied the rational-basis test in their analysis. 277 N.W.2d at 453–54.

[¶ 41] I cannot find any case law or treatise that supports using the rational-basis analysis of determining a "legitimate state interest" as a *quid pro quo* for determining a "legislative goal" under the intermediate standard of review. Under the rational-basis standard, our Court can review any identifiable purpose that may conceivably have been that of the Legislature. Under our strict scrutiny standard of review, the burden is on the state to articulate a "compelling governmental interest" that justifies the classification. *See Gange v. Clerk of Burleigh County Dist. Court*, 429 N.W.2d 429, 433 (N.D.1988) (outlining the standards for judicial scrutiny of equal protection claims). If our Court is not going to require under the intermediate standard of review some articulation of a legislative goal in either the statute or legislative history, then we should no longer use this standard as a guise for a "heightened" standard of review. If the majority has applied a more vigorous standard of review than rational-basis, I cannot discern it. The majority opinion professes to apply an intermediate standard of review, but in effect, applies a rational-basis standard of review.

[¶ 42] The United States Supreme Court is using an intermediate standard of review in equal protection cases "that is not as difficult for the government to meet as the compelling interest test, but which involves far less deference to the legislature than does the rationality test." Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law—Substance and Procedure* § 18.3, at 219 (3d ed.1999). Our Court recognized this development in *Johnson v. Hassett*, 217 N.W.2d 771, 776 (N.D.1974), and concluded that such standard was similar to our intermediate standard of review. *See also Arneson v. Ol-*

*son*, 270 N.W.2d 125, 133 (N.D.1978). The United States Supreme Court in *United States v. Virginia*, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996), in applying this intermediate standard of review states that: "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." In the present case, the legislative history makes it crystal clear that the statute of repose was designed to remedy the rising cost of malpractice insurance. *Hearing on S.B. 2348 Before the Senate Judiciary Comm.*, 44th N.D. Legis. Sess. (Feb. 5, 1975) (testimony of H.W. Wheeler, Counsel for the North Dakota Medical Association). The majority, recognizing its weakness under *Hanson v. Williams County*, 389 N.W.2d 319 (N.D. 1986), and *Dickie v. Farmers Union Oil Co. of LaMoure*, 2000 ND 111, 611 N.W.2d 168, uses its professed authority to find "unarticulated" legislative goals to conclude that the Legislature must have intended "to limit what would otherwise be virtually unlimited and perpetual exposure to liability" and "to avoid the difficulty in proof and record keeping which suits involving older [claims] impose." The first "unarticulated" goal is taken from *Bellemare*, 420 N.W.2d at 737, and the second is taken from *Golden v. Johnson Mem'l Hosp., Inc.*, 66 Conn.App. 518, 785 A.2d 234, 241 (2001), a decision using the rational-basis test to determine "legitimate state interest."

[¶ 43] Our Court's decisions in *Hanson* and *Dickie* correctly apply the intermediate standard of review to an equal protection challenge to a statute. *Hanson*, 389 N.W.2d 319; *Dickie*, 2000 ND 111, 611 N.W.2d 168. The issue in both *Hanson* and *Dickie* is whether the statute of repose in the Product Liability Act is unconstitutional under the equal protection clause of the North Dakota Constitution. In both cases, we found it unconstitutional. *Hanson*, at 330; *Dickie*, at ¶ 13. In *Han-*

*son,* we quoted the statute, N.D.C.C. § 28–01.1–01, which indicated the goals of the Legislature:

4. The legislative assembly finds that *the number of lawsuits and claims for damages and the amount of judgements and settlements arising from defective products has substantially increased in recent years.* Because of these increases, the *insurance industry has drastically increased the cost of products liability insurance.* The effect of increased insurance premiums and increased claims has *increased product cost* through manufacturers, wholesalers, and retailers *passing the cost of premiums to the consumer.* Certain *product manufacturers are discouraged from continuing to provide and manufacture certain products* because of the high cost and *possible unavailability of products liability insurance.*

5. Because of these recent trends and for the purpose of alleviating the adverse effects which these trends are producing in the manufacturing industry, *it is necessary to protect the public interest by enacting measures designed to encourage private insurance companies to continue to provide products liability insurance.*

6. *It is the purpose of sections* 28–01.1–01 through 28–01.1–05 to provide a reasonable time within which actions may be commenced against manufacturers, while *limiting the time to a specific period for which products liability insurance premiums can be reasonably and accurately calculated;* and to provide other procedural changes to *expedite early evaluation and settlement of claims.*

*Hanson,* at 327–28 (emphasis added). In *Hanson,* the same legislative goals, now cited by the majority to justify the classification under the medical malpractice statute of repose, were identified; i.e., a " 'crisis' facing North Dakota manufacturers because of unaffordable" or unavailable "products liability insurance," a need for early evaluation and settlement of claims and the ability for persons "to plan their affairs with a reasonable degree of certainty" as a matter of policy. *Hanson,* at 327–28; *see also Dickie,* at ¶ 7. In *Hanson* and *Dickie,* we concluded that there was no close correspondence between the "legislative goal of providing certainty in litigation or of reducing insurance costs" and the classifications established by the products liability statute of repose. *Dickie,* at ¶ 7; *see also Hanson,* at 328. Our Court could not find any showing within the statute, the testimony before the legislative committees, or the data submitted:

that litigation brought by victims injured more than 10 years from the initial date of purchase of a product or 11 years from its manufacture, as compared to persons injured within those time periods, *has caused inequity, unfairness, or unreasonable exposure and unpredictability for manufacturers or suppliers in civil litigation. There is simply no demonstration by the testimony or evidence submitted to the legislature which shows harm or prejudice to sellers and manufacturers resulting from damage awards against them for injuries incurred more that 10 years from initial purchase or 11 years from manufacture of defective products.* We, therefore, hold there is not a close correspondence between the legislative objectives under N.D.C.C. § 28–01.3–08 and the classification created thereunder to withstand an equal protection challenge under N.D. Const. art. I, § 21.

*Dickie*, at ¶ 9 (emphasis added); *see also Hanson*, at 329 (Levine, J., specially concurring) ("No one ... was able to present data that established a close correspondence between eliminating claims for relief of persons injured by products after ten years from sale, and controlling the rising premiums for products liability insurance.").

[¶ 44] In the present case, the legislative history and the statute are likewise devoid of any showing that litigation brought by victims of medical malpractice whose injury manifests itself more than six years from the initial act or omission of the alleged malpractice, as compared to persons injured within that time frame, has "caused inequity, unfairness, or unreasonable exposure and unpredictability" for physicians. *Dickie*, 2000 ND 111, ¶ 9, 611 N.W.2d 168. Similar to Justice Levine's observation in *Hanson*, there is no evidence that establishes "a close correspondence between eliminating claims for relief of persons injured by [medical malpractice] after [six] years ... and controlling the rising premiums for [medical malpractice] insurance." *Hanson*, 389 N.W.2d at 329 (Levine, J., specially concurring). As we stated in *Hanson* and reiterated in *Dickie*, "when we are dealing with human life and safety we believe that more is required for a justification than a reference to the economics of suppliers of goods." *Hanson*, at 328; *Dickie*, at ¶ 13.

[¶ 45] It must be noted that in *Arneson*, our Court held the Medical Malpractice Act, N.D.C.C. ch. 26–40.1 (1977) unconstitutional. *Arneson*, 270 N.W.2d at 126. We concluded that the legislative limitation of recovery to a maximum of $300,000 arising from any one occurrence is violative of the equal protection provision of the North Dakota Constitution. *Id.* at 136. The general purposes of the Act were stated to be:

"to assure the availability of competent medical and hospital services to the public in North Dakota at reasonable costs; to provide prompt and efficient methods for eliminating the expense involved in nonmeritorious malpractice claims; to provide adequate compensation to patients with meritorious claims; and to encourage physicians to enter the practice of medicine in North Dakota and remain in such practice as long as they are qualified to do so. The legislative assembly finds that the exercise of the sovereign and police power of this state for the good of the majority of its citizens is necessary to improve the availability of medical care, to assure its competency, and to reduce the cost thereof." Sec. 26–40.1 01, N.D.C.C.

*Id.* at 127. We noted that "[i]n recent years, a number of States have reacted to what is described as a 'medical malpractice crisis,' and have adopted various kinds of statutes in response." *Id.* at 130. We applied our intermediate standard of review. *Id.* at 133. We said:

When we examine the legislative purpose of the Act, we find that the incidence of malpractice claims in North Dakota is far lower than the average in the United States.... Evidence in the present case shows that one of the largest insurance companies is accepting applications for malpractice insurance in North Dakota, and using rates lower than the national averages.... One comparison of rates given to the Legislature shows that premiums in North Dakota are the sixth lowest in the United States.

*Arneson*, at 136. Our Court could not find an "availability or cost crisis" in North Dakota. *Id.* Our Court concluded that, although told there was a medical malpractice crisis, there was no evidence of such crisis and that the $300,000 limitation on

recovery was a violation of the equal protection provision of the North Dakota Constitution. *Id.* Our Court held that the limitation of recovery of seriously damaged or injured victims of medical negligence did not promote the aims of the statute and violated the equal protection clause of the North Dakota Constitution. *Id.*

[¶ 46] In the present case, we should "question the solution" as we did in *Hanson*, 389 N.W.2d at 328 and *Dickie*, 2000 ND 111, 611 N.W.2d 168. We should be "concerned about statutes which arbitrarily deny one class of persons important substantive rights to life and safety which are available to other persons." *Hanson*, at 328. As Justice Levine stated in her special concurrence in *Hanson*,

> If we do not understand the causes of a problem, even conceding that a problem exists, I do not believe that legislation, which destroys the important substantive rights of a class of persons whose misfortune it was to be injured by a product over ten years old satisfies equal protection. There can be no close correspondence between a statutory classification such as we have here and a legislative objective when that objective is grounded on guesswork, frustration, and little more than a wing and a prayer.

*Id.* at 329.

[¶ 47] The majority claims there is a distinction between *Hanson* and this case. It claims the Insurance Commissioner opposed the legislation in *Hanson* and testified in favor of it in this case. The legislative history reveals the Insurance Commissioner testified:

> It is in a crisis situation. One company has decided to go out of the malpractice insurance business and others are threatening to do so. If a physician cannot get this type of insurance he is not going to be able to practice. There

are now only nine companies who write this kind of insurance, and statistics show that they are paying more claims than the premiums they collect, so it is a losing proposition for them. These statistics are for the nation and we do not have North Dakota statistics. This insurance rate in North Dakota is still fairly low, but there has already been a 100% increase.

*Hearing on S.B. 2348 Before the Senate Judiciary Comm.*, 44th N.D. Legis. Sess. (Feb. 5, 1975) (testimony of Bud Wigen, State Insurance Commissioner). The fact that the Insurance Commissioner testified there was a national medical malpractice insurance "crisis" is not the point, however. The point is that there is no testimony, no data, and no evidence to support any relationship, let alone a "close correspondence," between the classification, which denies recovery to those injured by medical malpractice more than six years after the act of malpractice, and the alleged national medical malpractice insurance "crisis." We are without any factual basis for the correlation between the limitation of recovery and the national medical malpractice crisis. The Insurance Commissioner said he did not have any North Dakota statistics and that the insurance rate in North Dakota is still "fairly low." *Hearing on S.B. 2348, supra* (testimony of Bud Wigen, State Insurance Commissioner). The record does not establish a "crisis" in North Dakota. The Insurance Commissioner testified the reason Aetna was going to discontinue their policies in North Dakota was that they were prevented from raising their rates in another state. *Hearing on S.B. 2348, supra* (testimony of Bud Wigen, State Insurance Commissioner).

[¶ 48] The majority opinion attempts to distinguish *Hanson* and contends this case is more like the majority author's opinion

in *Bellemare*. The majority reasons that because a person may live for decades before an act of medical malpractice manifests itself in an injury, there is a "possibility" of long-term liability. Therefore, this case is more like an improvement to real estate, which has a longer life than to a defective product, which has a limited useful life. Our Court, in *Dickie*, however, identified a different "crucial distinction between the classification of potential defendants." *Dickie*, 2000 ND 111, ¶ 10, 611 N.W.2d 168. On the one hand, there are "[a]rchitects, contractors, engineers, and inspectors ... [who] do not have continuing control over or involvement with the maintenance of the improvement after ... initial construction." *Id.* (quoting *Bellemare*, 420 N.W.2d at 738). On the other hand, there are "[s]uppliers and manufacturers ... [who] can ... maintain high quality control standards in the controlled environment of the factory." *Id.* The majority places physicians who are directly charged with the health, welfare, and safety of human beings in the same classification as architects who design improvements to real property, the construction of which is participated in by many. I do not agree.

[¶ 49] Finally, all of the cases from other jurisdictions cited by the majority in support of its conclusion that the medical malpractice statute of repose is constitutional use the rational-basis standard of review.

[¶ 50] Some courts, however, have found medical malpractice statutes of repose unconstitutional where exceptions were granted. *See Carson v. Maurer*, 120 N.H. 925, 424 A.2d 825, 830–31 (1980) (holding the medical malpractice statute violates the equal protection provisions of the New Hampshire Constitution under an intermediate level of scrutiny); *Austin v. Litvak*, 682 P.2d 41, 44 (Colo.1984) (apply-

ing the rational-basis test and holding the three-year statute of repose violated equal protection). Other states have held their medical malpractice statutes of repose to be unconstitutional on other grounds. *See Martin v. Richey*, 711 N.E.2d 1273, 1285 (Ind.1999) (holding that the statute of repose as applied to this particular plaintiff violated the privileges and immunities clause of the state constitution because the misdiagnosed plaintiff had a disease with a long latency period which prevented her from discovering the malpractice within the statutory two-year period); *McCollum v. Sisters of Charity of Nazareth Health Corp.*, 799 S.W.2d 15, 19 (Ky.1990) (holding that the five-year medical malpractice state of repose violated the open courts provisions of the state constitution); *Hardy v. VerMeulen*, 32 Ohio St.3d 45, 512 N.E.2d 626, 629 (1987) (holding that the four-year statute of repose "as applied to bar the claims of medical malpractice plaintiffs who did not know or could not reasonably have known of their injuries, violates the right-to-a-remedy provision of ... the Ohio Constitution"); *DeYoung v. Providence Medical Center*, 136 Wash.2d 136, 960 P.2d 919, 926 (1998) (applying rational-basis review and holding that the eight-year statute of repose violated the privileges and immunities clause of the state constitution); *Kohnke v. St. Paul Fire & Marine Ins. Co.*, 140 Wis.2d 80, 410 N.W.2d 585, 588 (Ct.App.1987) (holding that the five-year statute of repose as applied, violated the right-to-a-remedy clause of the state constitution); *cf. Kenyon v. Hammer*, 142 Ariz. 69, 688 P.2d 961, 967 (1984) (not reaching the issue, but advising that "any statute which bars a cause of action before it could legitimately be brought abrogates rather than limits the cause of action" offending the state constitution).

[¶ 51] In conclusion, I am of the opinion that the analysis of *Hanson* is correct and that "[s]ome rational basis must be advanced for the selection of the period of years for 'bar' or 'repose,' other than the economic interests ..." of insurance companies and physicians. *Hanson*, 389 N.W.2d at 328. I would hold the statute unconstitutional and remand the case for further proceedings.

[¶ 52] WILLIAM A. NEUMANN, J., concur.