**SIGNAL MANAGEMENT CORPORATION, Plaintiff and Appellant,**

v.

**Raymond A. LAMB, Defendant and Appellee.**

**SIGNAL MANAGEMENT CORPORATION, Plaintiff and Appellant,**

v.

**FIRST BANK SYSTEMS, INC., a Delaware Corporation, Defendant and Appellee.**

**Civ. Nos. 950069, 950070.**

Supreme Court of North Dakota.

Dec. 29, 1995.

Orlin W. Backes, of McGee, Hankla, Backes & Wheeler, Ltd., Minot, for plaintiff and appellant. Appearance by Shane C. Goettle.

David J. Hauff, of McNair, Larson & Carlson, Ltd., Fargo, for defendant and appellee Raymond A. Lamb.

Todd E. Zimmerman, of Dorsey & Whitney, Fargo, for defendant and appellee First Bank Systems, Inc.

VANDE WALLE, Chief Justice.

Signal Management Corporation [Signal] appealed from a judgment dismissing its consolidated actions against Raymond A. Lamb and against First Bank Systems, Inc. [collectively referred to as First Bank] for breach of a lease agreement. We conclude the acceptance of a breach must be viewed in terms of a breach of contract and we reverse and remand for further proceedings applying that view.

On November 20, 1987, Dakota Financial Services [Dakota], whose parent corporation later merged with First Bank, leased office space from Signal in Minot. The lease was signed by William Kuzas, then vice president of Dakota, and James Jensen, the president of Signal. The lease ran from December 1, 1987 through December 1, 1990, and included the following option for Dakota to extend the lease:

"17. *OPTION TO EXTEND:* THIS LEASE MAY BE EXTENDED FOR ONE ADDITION [sic] THREE (3) YEAR PERIOD BEGINNING WITH THE TERMINATION DATE OF THE ORIGINAL TERM OF THIS LEASE UPON THE SAME TERMS AND CONDITIONS AS IN THE ORIGINAL TERM OF THIS LEASE; PROVIDED, HOWEVER, THAT THE TENANT SHALL GIVE WRITTEN NOTICE TO THE LANDLORD SIXTY (60) DAYS PRIOR TO THE END OF THE ORIGINAL

TERM THAT IT DOES DESIRE TO EXTEND THE LEASE."

On November 13, 1990, less than 60 days prior to the end of the original lease term, Signal contacted William Plessinger, Dakota's office manager, and asked whether Dakota intended to extend the lease. Plessinger had an employee hand deliver a letter from Plessinger to Signal on November 15, 1990, stating that Dakota "would like to exercise the option to continue the lease for an additional 3 years, under the same terms as the original lease." Jensen's handwritten notation on the Plessinger letter states "accepted as per phone (with Mr. Plessinger) conversation 11/14/90 10:40 a m"

After Jensen heard in late December 1990 that Dakota had been sold, Signal's attorney sent a letter to Dakota's president, William Spyker, contending that the lease had been extended by Plessinger. After discussing the matter with Dakota's attorney, Spyker wrote to Signal stating that Dakota would terminate the lease and vacate the premises on February 1, 1991. Dakota's attorney wrote to Signal's attorney in January 1991 explaining its position that Plessinger had no authority to extend the lease and that "[w]hether you agree or not, I trust you have alerted your client in respect to his duties to mitigate any damages and relet the premises, if you continue to maintain that the lease extension is valid." Dakota vacated the premises on February 1, 1991, and the corporation was dissolved in April 1991.

After Dakota vacated the premises, Signal reentered, rekeyed the locks, and advertised the space for rent. Signal later transferred title to the property to its sole shareholder, Jensen. On November 4, 1992, Jensen leased the space to a new tenant for a term beginning September 15, 1992 and ending August 31, 1995. Signal separately sued First Bank and Lamb, a former Dakota corporate officer and shareholder, seeking more than $37,000 in unpaid rent. The court consolidated the actions.

First Bank raised numerous defenses, including that no valid lease extension occurred because Plessinger did not have actual or ostensible authority to extend the lease agreement for Dakota, that the extension was void under the statute of frauds, and that Signal had accepted Dakota's surrender of the premises, thereby precluding the claim for unpaid rent.

Following a bench trial, the court ruled that Dakota was not liable for unpaid rent because Signal and Jensen held the premises for their own benefit and accepted Dakota's surrender on February 1, 1991. In support of its decision, the court noted that Signal did not respond or otherwise communicate with Dakota or its counsel after the January 1991 letter setting forth Dakota's position on the lease extension until it brought suit almost two years later. The trial court also found that Signal did nothing to notify Dakota of its intention to claim damages under the lease, provided no periodic billing statements, no accounting for rents received, and no notification of the change of ownership from Signal to Jensen. The trial court also observed that the terms of the new lease reletting the premises to another tenant extended beyond the expiration of the extended lease term with Dakota. Because of its ruling on the surrender and acceptance issue, the trial court did not resolve the other issues raised by the parties and dismissed Signal's actions.

On appeal, Signal asserts the trial court erred in ruling that Signal accepted surrender of the leased premises from Dakota.

Whether a surrender and acceptance occurred is a question of fact which will not be reversed on appeal unless it is clearly erroneous under N.D.R.Civ.P. 52(a). *See Reid v. Mutual of Omaha Ins. Co.*, 776 P.2d 896 (Utah 1989); *Development Enterprises, Inc. v. Miyamoto*, 461 P.2d 419 (Wyo.1969). A finding of fact is clearly erroneous if it is induced by an erroneous view of the law. *Matter of Guardianship of Nelson*, 519 N.W.2d 15 (N.D.1994). Because we believe the trial court's finding was induced by an erroneous view of the applicable law, we agree the trial court's finding that Signal accepted surrender of the premises is clearly erroneous.

I

A brief review of the origins of modern landlord-tenant law is helpful in resolving the

issue. The early common law recognized a distinction between leases of real property and other contracts and, by 1500, a lease was characterized as a conveyance of an estate in real property and the landlord and tenant were viewed as being in privity of estate rather than merely in privity of contract. *See Sun Cal, Inc. v. United States*, 25 Cl.Ct. 426 (1992); 2 R. Powell, *The Law of Real Property* § 16.02[1] (1994); 1 *American Law of Property* § 3.1 (1952). Because of the common law focus on estate and property concepts rather than on the contractual nature of the lease, lessors had no duty to mitigate damages after a breach by the lessee. *See Sun Cal; Schneiker v. Gordon*, 732 P.2d 603 (Colo.1987). Under the common law view of a lease as a conveyance, so long as the tenant owned the leasehold estate the rental obligation continued until the leasehold was extinguished in some manner. *See Schneiker.*

Surrender and acceptance is a recognized method of extinguishing the leasehold. *See* 4 H. Tiffany, *The Law of Real Property* § 960 (3d ed.1975). Under that doctrine, if the landlord elected to accept the surrender of the premises upon abandonment by the lessee, the lease was terminated and there was no continuing obligation for rent. *See Schneiker;* 4 H. Tiffany, at §§ 961, 962 and 963. But the landlord could also decline to accept the offer of a surrender that was implicit in abandonment and could continue to hold the tenant liable for rent as it became due. *See Schneiker.* A surrender may be either "express" or "by operation of law." 4 H. Tiffany, at § 961. We have recognized that a surrender by operation of law results "from acts of the parties to the lease which imply mutual consent to the termination." *Sanden v. Hanson*, 201 N.W.2d 404, 409 (N.D.1972).

The pure common law approach which interpreted a lease essentially as the grant of an estate in real property engendered sharp criticism from courts and commentators alike because it tended to encourage economic and physical waste and ignored that a modern lease is more like a continuing contractual obligation than the purchase of an estate. *See, e.g.,* 1 *American Law of Property*, at

§ 3.11; Annot., *Landlord's Duty On Tenant's Failure to Occupy, or Abandonment of, Premises, to Mitigate Damages by Accepting or Procuring Another Tenant*, 21 A.L.R.3d 534 (1968).

In 1977, this court rejected the pure common law approach and joined the modern trend, holding:

> "[T]he landlord has a duty to mitigate the damages which arise out of his tenant's default. While we agree that the general welfare is served more by the use of property than by its idleness, we are persuaded that the contract qualities of a five-year lease are sufficient to require the use of contract remedies and limitations to those remedies."

*MAR–SON, Inc. v. Terwaho Enterprises, Inc.,* 259 N.W.2d 289, 291 (N.D.1977). *See also* N.D.C.C. § 47–16–13.5 (imposing duty to mitigate damages in residential lease situations). The dual nature of a lease as both a contract and a conveyance of an interest in land has important implications for resolving disputes between landlords and tenants. These implications were overlooked by the trial court in this case.

■ There is an obvious tension between the common law doctrine of surrender by operation of law and the lessor's obligation to mitigate damages. One court has explained:

> "[C]ommon law courts have sometimes found a surrender by operation of law in certain situations where a lessor responds to the lessee's abandonment of the property, for example, by reletting or selling the property to a third party. The courts concluded that such a relet or sale was inconsistent with the original lessee's estate in the property and, therefore, based on an implied agreement or estoppel theory, constituted a binding recognition by the lessor that the estate no longer existed. The recognition of the end of the estate was crucial because under early common law, with the end of the estate necessarily came the end of the lessee's obligation with respect to future rents under the lease.

> \* \* \*

> "Reletting and selling property are two of the most direct ways for a lessor to miti-

gate damages. Hence, whatever may be the proper inference to draw from a relet or a sale in the absence of a duty to mitigate, if a duty to mitigate exists, it clearly cannot be presumed that the lessor's relet or sale of the leased property demonstrates an intent to accept a surrender. It is at least as likely to be merely an attempt to mitigate damages. *See* 49 Am. Jur.2d *Landlord and Tenant* § 625 (1970) ('Consent to a surrender terminating liability for rent should not be implied from the mere fact of a reletting in a jurisdiction which follows the view that the landlord is bound to reduce damages resulting from wrongful abandonment by the tenant by reletting the premises if possible . . .' (footnotes omitted)).''

*Sun Cal, Inc.*, 25 Cl.Ct. at 432, 433. A tenant's burden of proving a landlord's intent to accept surrender, *see Sanden,* is an onerous one when the landlord is also under an obligation to mitigate damages.

■ The trial court's decision lacks any analysis of mitigation of damages. Although the trial court noted at the outset that "a landlord has the option to accept surrender of the premises or enforce the lease and attempt to mitigate damages," the court's decision did not further consider mitigation of damages. Many of the facts relied on by the court are as consistent with mitigation of damages as they are with surrender and acceptance of the lease. However, the *MAR-SON* holding is not applied, and there are no findings about whether any of Signal's actions were taken in a good faith or a bad faith effort to mitigate damages. *See also Ruud v. Larson,* 392 N.W.2d 62 (N.D.1986).

Significantly, the trial court primarily relied on two cases as authority for its holding, *Bernard v. Renard,* 175 Cal. 230, 165 P. 694 (1917) and *Casper Nat'l Bank v. Curry,* 51 Wyo. 284, 65 P.2d 1116 (1937). Both cases apply the common law doctrine of surrender by operation of law. Neither jurisdiction imposed, as have we since 1977, a duty on a lessor to mitigate damages. In a jurisdiction which imposes a duty to mitigate, cases applying the pure common law doctrine of surrender and acceptance are of little persuasive value.

■ We conclude the trial court's finding that Signal accepted surrender of the premises was induced by an erroneous view of the law as to the interrelationship of surrender and acceptance and mitigation of damages. We do not hold that the trial court's finding would necessarily be clearly erroneous if it were reached after the trial court had properly viewed the doctrine of surrender and acceptance in conjunction with a lessor's duty to mitigate damages. *See, e.g., Reid,* 776 P.2d at 900 n. 2. Rather, the law of leases is "a blend of property concepts and contractual doctrines. . . ." 2 R. Powell, at p. 16–10. As one court explained, "[w]hether contract principles, property principles, or a blend of both control the resolution of a particular case depends largely on the intent of the parties, the interests of society, and the relative fairness of the results to be achieved through selection among the potentially applicable principles." *Schneiker,* 732 P.2d at 607. *See also Sommer v. Kridel,* 74 N.J. 446, 378 A.2d 767 (1977).

We reverse the judgment and remand for further consideration under the appropriate legal standard.[1]

## II

As an alternate basis for affirming the judgment, First Bank asserts that, as a matter of law, Dakota's alleged extension of the lease is barred by the statute of frauds because Plessinger's authority to exercise the option was not in writing. We disagree.

Section 9–06–04(3), N.D.C.C., provides:

"*Contracts invalid unless in writing— Statute of frauds.* The following contracts are invalid, unless the same or some note or memorandum thereof is in writing and subscribed by the party to be charged, or by his agent:

\* \* \*

---

1. Signal argues that even if it accepted surrender of the premises under property law concepts, it may still recover the unpaid rent on a separate contract theory. Because this argument was not specifically presented to the trial court, we do not consider it. *See Knife River Coal Mining Co. v. Neuberger,* 466 N.W.2d 606 (N.D.1991).

"3. An agreement for the leasing for a longer period than one year, or for the sale, of real property, or of an interest therein. Such agreement, if made by an agent of the party sought to be charged, is invalid unless the authority of the agent is in writing subscribed by the party sought to be charged."

There is no dispute that the original lease was in writing and signed by the appropriate party to be charged. There is also no dispute that Plessinger's authority, if any, to exercise the option to extend the lease is not in writing.

First Bank relies on *Brookhill Management Corp. v. Shah*, 197 Ga.App. 305, 398 S.E.2d 290 (1990), *Beller v. Robinson*, 50 Mich. 264, 15 N.W. 448 (1883), and *Ochoa v. Estate of Sarria*, 97 A.D.2d 538, 468 N.Y.S.2d 44 (1983), for the proposition that an option contained in a lease, and an agent's authority to exercise it, fall within the statute of frauds requiring a writing. However, *Shah, Beller,*[2] and *Ochoa*[3] represent a very minority view.

The predominant view is described in *Gruber v. Castleberry*, 23 Ariz.App. 322, 533 P.2d 82, 83 (1975):

"As a general rule, an oral notice of election to exercise an option for renewal of a written lease does not violate the Statute of Frauds. *See* Annot., 51 A.L.R.2d 1404, 1420 (1957). This result obtains on the theory that the terms and conditions of the contract are embodied in the lease, which is in writing, and the only effect of notice is to make the original lease operative for the renewal period."

■ We agree with this rationale and hold, like the majority of courts considering similar statutes of fraud, that the exercise of an option, and the authority of an agent to exercise it, are not required to be in writing. *See, e.g., Ripani v. Liberty Loan Corp.*, 95 Cal.App.3d 603, 157 Cal.Rptr. 272 (1979); *Daehler v. Oggoian*, 72 Ill.App.3d 360, 28 Ill.Dec. 250, 390 N.E.2d 417 (1979); *Marckres Bros. v. Perry Gas Works*, 189

Iowa 1204, 179 N.W. 538 (1920); *Continental Builders, Inc. v. Leach*, 5 Kan.App.2d 766, 625 P.2d 5 (1981); *Kern v. Pawlega*, 5 Mich. App. 384, 146 N.W.2d 689 (1966); *Economy Stores, Inc. v. Moran*, 178 Miss. 62, 172 So. 865 (1937); *Wolf v. Tastee Freez Corporation of America*, 172 Neb. 430, 109 N.W.2d 733 (1961); *Ketcham v. Oil Field Supply Co.*, 99 Okl. 201, 226 P. 93 (1923); *McClelland v. Rush*, 150 Pa. 57, 24 A. 354 (1892).

Relying on *Ripani, Rosenaur v. Pacelli*, 174 Cal.App.2d 673, 345 P.2d 102 (1959), and *Brent Liquid Transport, Inc. v. GATX Leasing Corp.*, 650 F.Supp. 467 (N.D.Miss.1986), First Bank also asserts that, because there is no dispute the stated time for exercising the option had expired before any attempt was made to exercise it, as a matter of law Plessinger's actions were merely a new offer to lease the premises which required acceptance by Signal thereby requiring the written authority of Plessinger to satisfy the statute of frauds. Again, we disagree.

In *Ripani*, 157 Cal.Rptr. at 276 n. 2, which held that neither the timely exercise of an option nor an agent's authority to exercise the option need be in writing, the court distinguished *Rosenaur*, in which the court had earlier ruled that an attempted exercise of an option in a lease was untimely and invalid. The court in *Rosenaur*, 345 P.2d at 106, had stated that "such offers, if accepted, would fall squarely within the provisions of" the statute of frauds. Because the exercise of the option was timely in *Ripani*, that court found *Rosenaur* inapposite.

But, there is another reason why *Rosenaur* was inapposite to the situation in *Ripani*, and why both *Rosenaur* and *Brent Liquid Transport*, which also ruled an untimely attempt to exercise an option was invalid, are distinguishable from this case. Both *Rosenaur* and *Brent Liquid Transport* were actions against optioners brought by optionees who claimed they had sufficiently complied with the terms of the options. Here, Signal, the optioner, has sued the optionee, Dakota, seeking to enforce the option and the op-

---

2. It is questionable whether *Beller* remains good law in Michigan. *See Darling v. Hoban*, 53 Mich. 599, 19 N.W. 545 (1884); *Kern v. Pawlega*, 5 Mich.App. 384, 146 N.W.2d 689 (1966).

3. *Ochoa* has been criticized, *see Stark v. Fry*, 129 A.D.2d 237, 517 N.Y.S.2d 643 (1987), and appears to have been overruled in *Kaplan v. Lippman*, 75 N.Y.2d 320, 552 N.Y.S.2d 903, 552 N.E.2d 151 (1990).

tionee is defending on the ground that it did not comply with the terms of the option.

In *Village West Associates v. Boeder*, 488 N.W.2d 376, 378 (N.D.1992), we distinguished our prior case law which, like the courts in *Rosenaur* and *Brent Liquid Transport*, had applied a strict compliance analysis to the exercise of an option:

> "Each of those cases involved an optionee claiming compliance with an option. The underlying rationale for the decisions in those cases is that because the optioner is bound to perform the irrevocable offer if the option is properly exercised, the optionee must strictly comply with the terms of the option. In those cases, the optioner did not claim that the optionee had complied with the terms of the option, and no issue was raised about whether or not the optioner had waived any terms of the option.
>
> "In *Fries [v. Fries*, 470 N.W.2d 232 (N.D.1991) ], we noted that the optioner may waive terms pertaining to the exercise of the option. That statement follows the well established principle that a landlord may waive the manner of notice and the time for the exercise of a renewal option...." [Citations omitted].

■ Here, the optioner, Signal, claims that it waived the time requirements for exercising the option. The trial court, however, made no findings on the issue. On remand, the trial court should make the necessary findings on this issue, as well as the other factual issues raised by the parties. For purposes of this opinion, we hold only that the statute of frauds would not be violated if Signal is found to have waived the 60–day time requirement for exercising the option.

We do not consider the other arguments of the parties because their resolution depends on factual findings that have not been made by the trial court. Accordingly, we reverse the judgment and remand for further proceedings.

SANDSTROM, MESCHKE, LEVINE and NEUMANN, JJ., concur.