2004 ND 26

**William A. PIERCE and Carol Pierce, Plaintiffs and Appellants**

v.

**B.P.O. OF ELKS LODGE NO. 1214, Defendant and Appellee.**

No. 20030017.

Supreme Court of North Dakota.

Jan. 28, 2004.

915

William A. Herauf (argued), Reichert & Herauf, P.C., Dickinson, N.D., and Gary L. Jackson, Sidney, MT, for plaintiffs and appellants.

H. Malcolm Pippin (argued), Nilles, Hansen & Davies, Ltd., Williston, N.D., for defendant and appellee.

MARING, Justice.

[¶ 1] William A. and Carol Pierce appealed from judgments dismissing their action against B.P.O. of Elks Lodge No. 1214 ("Elks") for breach of a business lease agreement and related damages. We conclude genuine issues of material fact exist which precluded the district court from dismissing the Pierces' claims through summary judgment. We reverse and remand for further proceedings.

I

[¶ 2] In the fall of 1994, the Elks in Williston leased part of its premises to the Pierces for the purpose of establishing a dining room and lounge business. The written lease agreement ran from October 1, 1994, through September 30, 1995. Under the agreement, the Pierces had an option to renew the lease for two additional one-year periods if they were current with the rent and complied with other obligations, and if lease renewal negotiations were commenced "at least 30 days prior to the expiration of the initial one year term of this lease." The Pierces were also required to give the Elks a $1,000 security deposit. The Pierces began to conduct business in the Elks during October 1994, and later negotiated with the Elks and renewed the lease from October 1, 1995, through September 30, 1996. This lease also gave the Pierces an option to renew for two additional one-year terms, provided the Pierces complied with their obligations under the lease agreement.

[¶ 3] According to Elks officials, they became concerned about the Pierces' business during the summer of 1996 because the premises was not being properly maintained, the business was operating with irregular hours, utility and rent bills were not being paid in a timely manner, and William Pierce had received unfavorable

publicity in the newspaper. According to William Pierce, lease negotiations took place before the lease ran out, but the Elks was renovating and remodeling parts of the building and was proposing changes about how the club would be run, and he was concerned how the changes would affect the business. William claimed that during September and October 1996, he asked an Elks official "when the new lease was going to be ready on a couple of different occasions and was always told that the lease was in the process of being prepared." No new lease was signed by October 1, 1996. According to William, he did not receive a copy of the proposed 1996–1997 lease until October 1996, but various changes had been made to the lease terms and the Pierces would not sign it.

[¶ 4] In mid-October 1996, the Elks decided to lease the premises to other persons. According to the Elks, officials met with William Pierce, all agreed to terminate the lease, and the Elks had an attorney prepare a document titled "Mutual Voluntary Termination of Business Lease and Assignment of Liquor and Beer Licenses and Rights in Charitable Gaming Permits," setting forth the terms the parties had agreed upon. The document required the Pierces to sell their existing food and beverage inventory to the new tenants, transfer the liquor and beer licenses and rights under charitable gaming permits to the new tenants for a certain price, and forfeit the $1,000 security deposit in lieu of cleaning the carpets and repairing Elks property. The Pierces did not sign the mutual termination agreement, but did vacate the premises, sell their inventory, and transfer the licenses and permits as called for by the written mutual termination agreement.

[¶ 5] In December 1998, the Pierces sued the Elks, claiming it breached the lease agreement by failing to honor the option to renew. The Pierces also sought return of their security deposit and payment for services, food and beverages that they supplied to the Elks trustees. The Elks claimed the parties had voluntarily terminated the lease, the security deposit was forfeited for the Pierces' failure to clean the carpet and make required repairs to the property, and the payment for additional services to the trustees was not the responsibility of the Elks. The district court granted the Elks' motion for summary judgment dismissing the complaint. The court held:

> Only one conclusion can reasonably be drawn from the evidence in this case: Despite the fact that Pierces did not *sign* the Mutual Termination Agreement, they nevertheless *fully performed* their obligations under that agreement and *accepted the benefits* thereof. Likewise, the Elks did all that was required of that entity under the agreement. According to the terms of the Mutual Termination Agreement, the business (i.e., lessor/lessee) relationship between the parties terminated effective November 1, 1996. Under the circumstances, the Court finds—as a matter of law—that Pierces have *no claim* against the Elks for breach of contract.

[¶ 6] The court did not address the Pierces' claim for payment for additional services, but dismissed the complaint in its entirety, as well as the Elks' counterclaims.

## II

[¶ 7] The Pierces argue the district court erred in granting summary judgment dismissing their breach of contract claim against the Elks.

[¶ 8] Our standard of review for summary judgments was recently summarized

in *Weiss v. Collection Ctr., Inc.*, 2003 ND 128, ¶ 8, 667 N.W.2d 567:

> Summary judgment is a procedural device which promptly resolves an action on the merits without a trial if the evidence shows either party is entitled to judgment as a matter of law and no dispute exists as to either the material facts or the reasonable inferences to be drawn from undisputed facts, or if resolving the factual disputes will not change the result. *Hoffner v. Johnson*, 2003 ND 79, ¶ 5, 660 N.W.2d 909. If reasonable persons could reach only one conclusion from the facts, issues of fact may become issues of law. *Fetch v. Quam*, 2001 ND 48, ¶ 8, 623 N.W.2d 357. "Even undisputed facts do not justify summary judgment if reasonable differences of opinion exist as to the inferences to be drawn from those facts." *Meide v. Stenehjem*, 2002 ND 128, ¶ 6, 649 N.W.2d 532. When reviewing a summary judgment, this Court views the evidence in the light most favorable to the non-moving party and gives that party the benefit of all favorable inferences which reasonably can be drawn from the evidence. *Hoffner*, at ¶ 5. We review de novo the question of law whether the trial court properly granted summary judgment. *Id.*

[¶ 9] The Pierces argue the court erred in ruling they had consented to the termination of their option to renew the lease, because they did not sign the mutual termination agreement and because their actions, although in conformity with the written agreement, were attempts to mitigate damages. The Elks argues the Pierces communicated their consent to the written agreement by performing its terms and accepting its benefits, and thereby surrendered the lease by operation of law. *See, e.g., Sanden v. Hanson*, 201 N.W.2d 404, 409 (N.D.1972).

[¶ 10] It is well-settled that parties to a lease of real property may by mutual consent terminate, alter, or amend their agreement. *Moen v. Thomas*, 2001 ND 95, ¶ 18, 627 N.W.2d 146; N.D.C.C. § 47–16–14(2). In *Sanden*, 201 N.W.2d at 409, this Court said:

> The mutual consent of the parties required by § 47–16–14 may be express or implied from the conduct of the parties. Thus a lease may be terminated or surrendered either by express agreement or by operation of law, whereby the surrender results from acts of the parties to the lease which imply mutual consent to the termination.

Whether a surrender and acceptance has occurred is a question of fact. *See Signal Management Corp. v. Lamb*, 541 N.W.2d 449, 451 (N.D.1995).

[¶ 11] It is equally well-settled that, "if there is a breach of a lease agreement, there is a duty on the nonbreaching party to minimize the damages." *Tweeten v. Miller*, 477 N.W.2d 822, 825 (N.D.1991); *see also* 49 Am.Jur.2d *Landlord and Tenant* § 97 (1995) (stating "[a] lessee is required to make a reasonable effort to mitigate damages resulting from a lessor's breach"). Therefore, the Pierces in this case had a duty to mitigate damages if the Elks breached the lease agreement as they claim.

[¶ 12] In *Lamb*, 541 N.W.2d at 452, this Court noted the "obvious tension between the common law doctrine of surrender by operation of law and the lessor's obligation to mitigate damages." In *Lamb*, the lessor sued the lessee for unpaid rents after the lessee had breached the lease and vacated the premises. After the lessee vacated the premises, the lessor leased to a new tenant. Following a trial, the court dismissed the action, ruling the lessor had accepted the lessee's surrender of the premises by operation of law which

extinguished the leasehold. This Court reversed and remanded for further consideration under the appropriate legal standard:

The trial court's decision lacks any analysis of mitigation of damages. Although the trial court noted at the outset that "a landlord has the option to accept surrender of the premises or enforce the lease and attempt to mitigate damages," the court's decision did not further consider mitigation of damages. Many of the facts relied on by the court are as consistent with mitigation of damages as they are with surrender and acceptance of the lease. However, the *MAR–SON [, Inc. v. Terwaho Enterprises, Inc.*, 259 N.W.2d 289 (N.D.1977) ] holding is not applied, and there are no findings about whether any of Signal's actions were taken in a good faith or a bad faith effort to mitigate damages. *See also Ruud v. Larson*, 392 N.W.2d 62 (N.D.1986).

. . . .

We conclude the trial court's finding that Signal accepted surrender of the premises was induced by an erroneous view of the law as to the interrelationship of surrender and acceptance and mitigation of damages. We do not hold that the trial court's finding would necessarily be clearly erroneous if it were reached after the trial court had properly viewed the doctrine of surrender and acceptance in conjunction with a lessor's duty to mitigate damages. *See, e.g., Reid [v. Mutual of Omaha Ins. Co.*, 776 P.2d 896, 900 n. 2 (Utah 1989) ]. Rather, the law of leases is "a blend of property concepts and contractual doctrines . . . ." 2 R. Powell, [*The Law of Real Property*, at p. 16–10 (1994) ]. As one court explained, "[w]hether contract principles, property principles, or a blend of both control the resolution of a particular case depends largely on the

intent of the parties, the interests of society, and the relative fairness of the results to be achieved through selection among the potentially applicable principles." *Schneiker [v. Gordon*, 732 P.2d 603, 607 (Colo.1987) ]. *See also Sommer v. Kridel*, 74 N.J. 446, 378 A.2d 767 (1977).

*Lamb*, 541 N.W.2d at 453.

[¶ 13] The Pierces dispute that they mutually agreed to termination of the lease. According to William Pierce's affidavit, he "understood that we had the right to automatically renew the lease if we wanted to continue the lease with the same terms and that the renewals would only have to be renegotiated if we wanted to change something like pay less rent or pay less than all the utilities." William stated that in July 1996 he was invited to a meeting of the Elks board and was informed of plans to renovate and remodel the main floor of the Elks building, and a board member "approached me about the concept of returning the Elks lounge to its former status . . . of Elks members only and allowing the terms of our lease to stand as originally signed." William said that "[i]n September and early October 1996, I asked Jerry LeDosquet [then Exalted Ruler] when the new lease was going to be ready on a couple of different occasions and was always told that the lease was in the process of being prepared." The Pierces also claim they were current on their lease payments and all other lease obligations as of September 30, 1996, and received no written or oral notice from the Elks of any default or forfeiture under the provisions of the lease.

[¶ 14] According to William, in October 1996 the Exalted Ruler of the Elks gave him a copy of the proposed 1996–1997 lease, but the lease contained several amendments. William said, "I stated the

lease should stand as originally written, but was agreeable to a change in the operation plan as I had discussed with Ron Stenson in July, 1996." William said that during the middle of October 1996, he was informed by Elks officials that they would not renew the lease and had obtained another lessee. According to William, "[w]hen I asked why our lease was not being renewed I was told they didn't want to get into it, but they had someone coming November 1, 1996, and I had to be out by then. I was not given any other reason at that time, or previous to that time, as to why our lease would not be renewed." William further explained:

In the week following th[is] conversation ... Jerry LeDosquet and David Slais delivered to me a document entitled "Mutual Voluntary Termination of Business Lease and Assignment of Liquor and Beer Licenses and Rights in Charitable Gaming Permits". At the time the document was delivered to me nothing was said. A couple days later, Jerry LeDosquet came back into the kitchen and asked me if I had signed "it". I replied that I had not because I didn't agree with it. Neither I nor Carol ever signed the Mutual Voluntary Termination agreement, nor have either of us ever agreed to its terms verbally or otherwise.

Carol and I believed we had performed all of the terms and conditions of our lease and that we had a right to automatically renew our lease for an additional term. However, the Elks was giving us no choice but to begin to remove our property from the premises and look for another location to continue our business.

Since it was clear to me I had no choice but to leave and I had no other location readily available to move to, I also had no choice but to sell my food inventory, liquor inventory and liquor license. It was originally agreed with the Elks officers that the Elks would purchase these assets from Carol and I for $22,500.00.

One week before the end of October, 1996, I met with Ron Stenson and Dorothy (Dot) Balbinot, the Elks new lessee. Dot Balbinot told me she would not pay $22,500.00 for our inventory and licenses. I said that I wasn't leaving then until I received a written notice of termination of our Lease. Ron Stenson told me the Mutual Voluntary Termination was a 30 day notice and that the Elks lawyer would have Carol and I removed with no problems. The end result was that Carol and I felt forced into selling our inventory and licenses for $17,500.00. At that time we did not have anywhere to store or take our inventory to. We believed there was no other choice.

At no time did either Carol or I agree to the termination of rights and obligations under the Business Lease dated October 1, 1995.

[¶ 15] As in *Lamb*, the facts relied on by the district court to determine the Pierces had fully performed their obligations and accepted the benefits under the unsigned written termination agreement and thereby voluntarily surrendered the lease are equally consistent with the Pierces mitigating their damages for the Elks' alleged breach of the lease agreement. *Compare Felco v. Doug's N. Hill Bottle Shop*, 1998 ND 111, ¶ 16, 579 N.W.2d 576 (holding part performance of an oral agreement necessary to take the oral agreement out of the statute of frauds must be consistent *"only"* with the existence of the alleged oral contract). The Pierces' vacation of the premises, sale of the inventory, and transfer of the licenses and permits can be viewed as wholly con-

sistent with a good faith effort to minimize the damages caused by the Elks' alleged unilateral termination of the lease agreement on short notice. The district court did not address mitigation of damages in its decision and described the issues as being solely whether the Pierces took "any *action* consistent with the terms of the agreement," and whether they "accept[ed] any *benefits* under the agreement." The district court applied an inappropriate legal standard in this case. Viewing the evidence in the light most favorable to the Pierces, we conclude they have raised a genuine issue of material fact on whether they surrendered the lease and the Elks accepted the surrender by operation of law. A jury must make a factual finding on this issue after being properly instructed on the doctrine of surrender and acceptance in conjunction with a lessee's duty to mitigate damages. *See Lamb,* 541 N.W.2d at 453.

[¶ 16] The Elks argues summary judgment is nevertheless appropriate. The Elks claims the Pierces had no right to renew after September 30, 1996 because they breached the lease by failing to make rental payments and comply with other lease obligations, and because the Pierces had not renegotiated the lease by August 30, 1996, as required under the terms of the lease. However, the Pierces have alleged that they were current in their lease payments "and all other obligations under the lease." Furthermore, viewed in the light most favorable to the Pierces, the evidence suggests that the Elks simply delayed providing the Pierces a written lease agreement during September and October 1996, even though an agreement had been informally reached during the prior summer discussions between the parties. A jury will have an opportunity to address these disputed factual questions, if necessary, on remand.

## III

[¶ 17] The district court dismissed the Pierce's complaint in its entirety. The Pierces requested compensation for an outstanding balance due them for services, food and beverages supplied to the Elks trustees, but this claim was dismissed without explanation. On remand, the issue of whether the Pierces are entitled to this claimed compensation should be addressed.

## IV

[¶ 18] The judgments are reversed and the case is remanded for further proceedings.

[¶ 19] GERALD W. VANDE WALLE, C.J., WILLIAM A. NEUMANN, DALE V. SANDSTROM, and CAROL RONNING KAPSNER, JJ., concur.