BP PRUCENTER ACQUISITON LLC, vs. SAKS FIFTH AVENUE LLC, MISC 20-000353

































 
 BP PRUCENTER ACQUISITON LLC, Plaintiff, v. SAKS FIFTH AVENUE LLC, Defendant
 MISC 20-000353 
 JANUARY 29, 2021
SUFFOLK, ss.
ROBERTS, J.
MEMORANDUM OF DECISION AND ORDER ON SAKS FIFTH AVENUE LLC'S MASS. R. CIV. P. 12(b)(1) MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION














 INTRODUCTION 





 This action was commenced by plaintiff BP Prucenter Acquisition LLC ("BP") against defendant Saks Fifth Avenue LLC ("Saks") with the filing of a Complaint For Declaratory Relief ("the Complaint") on August 31, 2020 in which BP seeks a declaration as to its rights under a commercial lease with Saks pursuant to which Saks operates the Saks Fifth Avenue department store at the Prudential Center, 800 Boylston Street, Boston, Massachusetts. Complaint ¶ 1. More particularly, BP seeks a declaration that it has lawfully terminated the lease on account of Saks's failure to pay rent and other charges, that Saks now occupies the leasehold estate as a tenant at sufferance, and that Saks is liable to BP for rent and other charges as specified in the lease. Id. 





 On October 19, 2020, Saks filed Defendant's Motion To Dismiss For Lack Of Subject Matter Jurisdiction ("the Motion"). BP's opposition thereto was filed on November 23, 2020 and Saks's reply was filed on December 1, 2020. The matter was heard by videoconference on December 8, 2020. At that time, the court requested supplemental briefs on whether this action was governed by the summary process statute, G. L. c. 239, which falls outside this court's 

subject matter jurisdiction. BP's supplemental brief was filed on December 21, 2020 and Saks's supplemental brief was filed on December 30, 2020. 





 As set forth below, this case rides the boundary between real property law and contract law at the outer limits of, but not outside, this court's subject matter jurisdiction. Accordingly, the Motion is DENIED. 





THE RELEVANT FACTUAL ALLEGATIONS [Note 1] 





 BP owns the office and retail buildings commonly known as the Prudential Center in Boston, Massachusetts. Complaint ¶ 5. On or about June 20, 1967, BP's predecessor-in-interest entered into a commercial lease with Saks's predecessor-in-interest for the construction and operation of a Saks Fifth Avenue department store at the Prudential Center. Complaint ¶ 6. Over the years, the lease has been amended six times [Note 2] (the lease and its amendments are referred to herein as "the Lease"). Complaint ¶ 7. 





 Under the terms of the Sixth Amendment, the parties agreed to extend the existing term of the Lease by fifteen years, from November 2, 2018 to November 1, 2033. Complaint ¶ 8. Saks retained two additional 15-year extension options. Id. The premises currently demised to Saks under the Lease consists of 116,467 square feet of floor area ("the Premises"). Complaint ¶ 9. Saks and its predecessors-in-interest have operated a high-end retail store under the trade name "Saks Fifth Avenue" at the Premises since the store opened. Complaint ¶ 10. 





 The Lease includes the following provision regarding assignments, subleases and mortgages of the leasehold estate: 





 6.3. Tenant shall not assign, transfer, mortgage or pledge this Lease or sublease (which term shall be deemed to include the granting of licenses and the like other than licenses which are operated in the ordinary course of Tenant's business as part of the retail store on the Premises operated under the name "Saks Fifth Avenue" or under any other name which Tenant may be permitted to use pursuant to Section 6.1) all or any part of the Premises without obtaining on each occasion the consent of Landlord, or suffer or permit this Lease or the leasehold estate hereby created or any other rights arising under this Lease to be assigned, transferred or encumbered, in whole or in part, whether voluntarily, involuntarily or by operation of law, or permit the occupancy of the Premises by anyone other than Tenant.  Any attempted assignment, transfer, mortgage, pledge, sublease or other encumbrance made without such consent where required shall be void. 





Complaint, Ex. A, Section 6.3 (emphasis added). 





 The Lease requires that Saks make the following payments: 





  Pursuant to Section 4.1(a) (as amended by the Sixth Amendment), minimum annual rent in the amount specified in the Lease ("Minimum Rent"), payable in equal monthly installments in advance on the first day of each month; 





  Pursuant to Section 4.1(b) and Exhibit E, and the First, Third and Sixth Amendments, percentage rent ("Percentage Rent"), due and payable on a quarterly basis; 





  Pursuant to Section 4.2 (as amended by the First Amendment), Saks's share of real estate taxes, as additional rent; 





  Pursuant to Section 4.3, all charges for utilities used, rendered or supplied to the Premises, punctually when due;





  Pursuant to Section 4.4 (inserted by the First Amendment), the Saks CAM Charge, as defined in the Lease, as additional rent, on the first day of each month; and 





  Pursuant to Section 4.5 (inserted by the First Amendment), certain marketing costs. 





Complaint ¶¶ 11-17. 





 Section 9.1.a of the Lease defines a default to include any failure by Saks to perform any of its obligations under Section 4 that continues for ten days after written notice from BP to Saks designating such default. Complaint ¶ 18 and Ex. A, Section 9.1.a. Section 9.1 further provides that, upon the tenant's default, the landlord may "lawfully, immediately or at any time thereafter while such default exists . . . mail a notice of termination to Tenant, and upon such entry or mailing this Lease shall terminate, cease and be at an end." Complaint ¶ 19 and Ex. A, Section 9.1. Section 9.2 sets forth the tenant's obligations in the event the Lease is terminated due to the tenant's default: 





 Tenant further covenants as an additional and cumulative obligation after any such ending to pay punctually to Landlord all the sums and perform all the obligations which Tenant covenants in this Lease to pay and to perform in the same manner and to the same extent and at the same time as if this Lease had not been terminated. In calculating the amounts to be paid by Tenant under the next foregoing covenant Tenant shall be credited with any amount paid to Landlord as compensation as in this Section 9.2 provided and also with the net proceeds of any rent obtained by Landlord by reletting the Premises, after deducting all Landlord's expenses in connection with such reletting, including, without limitation, all repossession costs, brokerage commissions, fees for legal services and expenses of preparing the Premises for such reletting[.] 





Complaint ¶ 20 and Ex. A, Section 9.2. 





 Saks did not pay any of the Minimum Rent, Percentage Rent, Saks CAM Charges or any other applicable charges due under the Lease as of April 1, 2020. Complaint ¶ 23. 





 On April 27, 2020, BP's managing agent sent Saks by certified mail a default notice relating to Saks's failure to pay Minimum Rent due under the Lease for the month of April 2020 ("the Default Notice"), which stated: "Under the terms of the Lease, if this entire amount is not received by Landlord within ten (10) days of the effective date of this notice, Landlord may proceed with its remedies for a Tenant default, including termination of the Lease." Complaint ¶ 24 and Ex. B. Saks did not pay any amount of the Minimum Rent due for the month of April 2020 or the additional Minimum Rent that became due on May 1, 2020 within ten days following its receipt of the Default Notice. Complaint ¶ 26. 





 On May 18, 2020, BP's managing agent sent Saks a letter by certified mail notifying Saks that BP had terminated the Lease due to Saks's failure to pay rent when due ("the Termination Notice"): "Tenant is hereby notified, pursuant to Section 9.1 of the Lease, that the Lease is hereby terminated effective immediately." Complaint ¶ 27 and Ex. D. 





 On June 4, 2020, Saks sent a letter to BP in which Saks stated that it "denied and continues to deny any obligation to pay rent and other charges under the Lease at this time." Complaint ¶ 28 and Ex. E. 





 As of August 1, 2020, BP claims that Saks owes it $39,039.95 in Minimum Rent, $322,771.30 in real estate taxes, and $77,977.90 in operating, utility and marketing costs as Additional Rent (as defined in the Lease), for a total of $437,181.23. Complaint ¶ 31 and Ex. G. 





DISCUSSION 





The Standard Applicable To This Rule 12 (b) (1) Motion 





 "[A] motion under Mass. R. Civ. P. 12 (b) (1) . . . that is unsupported by affidavit presents a 'facial attack' based solely on the allegations of the complaint, taken as true for purposes of resolving the complaint." Callahan v. First Congregational Church of Haverhill, 441 Mass. 699 , 709-710 (2004), quoting Hiles, 437 Mass. at 516 n. 13 (2002), which in turn cites Holt v. United States, 46 F.3d 1000, 1002 (10th Cir. 1995). As with motions to dismiss brought pursuant to Mass. R. Civ. P. 12 (b) (6), the court "accept[s] the factual allegations in the plaintiffs' complaint, as well as any favorable inferences reasonably drawn from them, as true." Sullivan v. Chief Justice For Admin. & Mgmt. of the Trial Court, 448 Mass. 15 , 20-21 (2006), quoting Ginther v. Commissioner of Ins., 427 Mass. 319 , 322 (1998). 





The Relevant Law Regarding This Court's Subject Matter Jurisdiction 





 In its Complaint, BP points to G. L. c. 185, § 1(k), defining this court's jurisdiction, and G. L. c. 231A, the declaratory judgment statute, as the bases for jurisdiction over this action. Complaint ¶ 4. However, "General Laws c. 231A, § 1, does not expand the jurisdiction of the courts upon which it confers power to render declaratory decrees; the statute makes it clear that this power is conferred on the courts 'within their respective jurisdictions.'" Dunn v. Attorney General, 474 Mass. 675 , 689 (2016), quoting Sisters of Holy Cross of Mass. v. Brookline, 347 Mass. 486 , 491 (1964) (footnote omitted). Accordingly, this court's analysis is directed to G. L. c. 185, § 1(k), which provides that this court has original jurisdiction concurrent with the Supreme Judicial Court and the Superior Court over "[a]ll cases and matters cognizable under the general principles of equity jurisprudence where any right, title or interest in land is involved, including actions for specific performance of contracts." 





 Saks argues that, at its heart, this case presents a breach of contract, not a claim involving an interest in real property, that it does not implicate any special expertise of the Land Court, and that it therefore falls outside this court's jurisdiction. BP argues that a lease creates an interest in real estate and that its termination affects the parties' respective rights in the real estate, thus falling squarely within this court's jurisdiction. 





 In support of Saks's position, there is a line of cases, starting with Boston Hous. Auth. v. Hemingway, 363 Mass. 184 (1973), that has altered the common law view of the lease as a real property transaction, concluding insteadperhaps in too broad termsthat it is a contract between landlord and tenant. In Boston Housing Authority, the Supreme Judicial Court moved away from "the old common law assumption that a lease was in fact a conveyance of an estate in real property for a term.  'The ideal landlord delivered possession, then did nothing more; the ideal tenant paid his rent and demanded nothing more than possession.'" 363 Mass. at 188-189, quoting Notes, 56 Cornell L. Rev. 489, 490. Instead, the Boston Housing Authority court recognized an implied warranty of habitability applicable to residential units based on mutually dependent covenants: "The modern view favors a new approach which recognizes that a lease is essentially a contract between the landlord and the tenant wherein the landlord promises to deliver and maintain the demised premises in habitable condition and the tenant promises to pay rent for such habitable premises." 363 Mass. at 198. 





 Nearly thirty years later, in Wesson v. Leone Enters., 437 Mass. 708 (2002), the Supreme Judicial Court adopted the same analysis in recognizing mutually dependent covenants in commercial leases. The Wesson court stated: 





 [T]he premise underlying the continued viability of the independent covenants rule is that a commercial lease is a conveyance of property where the right to possession of the land constitutes the chief element of the exchange. This premise no longer comports with the reality of the typical modern commercial lease, which is intended to secure the right to occupy improvements to the land rather than the land itself, and which usually contemplates a continuing flow of necessary services from landlord to tenant, services that are normally under the landlord's control. See 1 M.R. Friedman, Leases § 1.1 (4th ed. 1997). 





437 Mass. at 720. The Wesson decision was subsequently cited for the proposition that "[t]he modern trend is to regard leases not 'as "conveyances," [but] as contracts for the possession of property.'" Humphrey v. Byron, 447 Mass. 322 , 326 (2006). And, citing to both Wesson and Humphrey, the Supreme Judicial Court stated in 275 Wash. St. Corp. v. Hudson River Int'l, LLC, 465 Mass. 16 , 27 (2013): "We agree that a commercial lease is a contract rather than a conveyance of property."





 That body of law being acknowledged, it is still beyond dispute that a lease, particularly a long-term commercial lease such as is at issue here, creates an interest in real estate: it is governed by G. L. c. 259, § 1, the Statute of Frauds ("Fourth, Upon a contract for the sale of lands, tenements or hereditaments or of any interest in or concerning them"), First Nat'l Bank v. Fairhaven Amusement Co., 347 Mass. 243 , 245 (1964) ("The leasehold was an interest in land and subject to the statute of frauds."); if for a term of more than seven years, it is required to be recorded in the registry of deeds in order to take effect against anyone other than those with actual notice pursuant to G. L. c. 183, § 4, which, notably, is the chapter of the General Laws entitled "Alienation of Land;" it is governed by applicable sections of G. L. c. 186, entitled "Estates for Years And At Will;" and it transfers possession of the real estate. Baseball Pub. Co. v. Bruton, 302 Mass. 54 , 55 (1938). 





 Moreover, even though the 275 Washington Street Corp. court stated that a commercial lease was a contract rather than a conveyance of real property, it went on to decline to adopt a remedy based in contract law"benefit of the bargain" damagesin the event of termination of a commercial lease: "For more than one hundred years, our common law has given landlords fair notice that they have no remedy for posttermination damages unless the commercial lease specifies a contractual remedy, and commercial landlords in Massachusetts have typically adapted to this rule by specifying the landlord's remedies in the lease." 465 Mass. at 29. "[W]e do not find this common-law rule to be broken and therefore see no reason to fix it." Id. at 30. It seems clear, then, that, even under the teaching of Boston Housing Authority and its progeny, a lease is not a contract for all purposes. [Note 3] See Motsis v. Ming's Supermkt., Inc., 96 Mass. App. Ct. 371 , 377 n. 16 (2019) ("At least for some purposes, the court has adopted the modern view that 'a commercial lease is a contract rather than a conveyance of property.' 275 Washington St. Corp. v. Hudson River Int'l, LLC, 465 Mass. 16 , 27, 987 N.E.2d 194 (2013). But see id. at 28 (holding that 'benefit of the bargain' principle for determining contract damages did not apply to termination of commercial lease following breach)."). 





 It can also be said that, although not routine, this court has asserted jurisdiction over various kinds of lease disputes, often without addressing the underpinnings of its subject matter jurisdiction. For example, several recent cases have addressed whether a right of first refusal contained in a lease is valid and enforceable. [Note 4] Other cases have addressed whether a tenant has properly exercised an option to extend or renew contained in a lease. [Note 5] And there are multiple one-off decisions involving leases. [Note 6] 





 1580 Realty, Inc. v. Rosen, 4 LCR 117 (1996) (Scheier, J.) appears to be closest to this case. There, the landlord brought an action against the tenant seeking a declaration that it had validly terminated their lease. The lease, executed in 1977 between landlord's predecessor and an entity known as Plywood Ranch Industries, Inc. ("Plywood"), allowed Plywood to sublease the leased premises with the landlord's consent, and provided for a ten-year term and, at Plywood's election, a ten-year extension. In 1985, the landlord and Plywood entered into a sublease agreement that permitted Plywood to sublease the premises, provided, however, (1) that landlord could terminate the sublease agreement and the lease if Plywood discontinued all business operations and had no assets other than the lease, and (2) that landlord would assume the obligations of Plywood under the sublease. Five years later, the landlord purported to terminate the lease based on Plywood's (by then operating under a different corporate name) voluntary dissolution. 





 The Land Court judge found that Plywood's successor, the individual defendant Charles Rosen ("Mr. Rosen") had sufficient material assets and maintained business operations sufficient to satisfy the requirements of the sublease agreement. She also found that the landlord treated Mr. Rosen as the successor to Plywood under the lease and sublease agreement and continued to accept rent from him without reservation for over a year before giving notice of default. Finally, she found that, even if the landlord had the right to terminate the lease, its actions constituted an election not to terminate the lease and sublease agreement and were tantamount to a waiver. In sum, she determined that the lease had not been terminated. 





 Notably, the tenant in 1580 Realty, Inc. was no longer in possession of the leasehold estate, having subleased it to another with the landlord's permission, and so the action did not involve a tenant in possession under a lease. It also did not address a lease termination based on non-payment of rent, Plywood and its successors having continued to pay the rent until the landlord rejected the payments. 





 Neither the parties nor the court have found a Land Court case, such as the case here, in which a landlord sought a declaration that a lease was terminated for nonpayment of rent against a tenant in possession. That is likely because, under normal circumstances, an action for non payment against a tenant in possession would be brought pursuant to G. L. c. 239, the statute governing summary process proceedings, an expedited proceeding that is not within this court's subject matter jurisdiction. See Davis Inv. Corp. v. Thayer Assocs., 1999 Mass. App. Div. 202 (1999) ("The only four departments of the Massachusetts Trial Court with jurisdiction in summary process actions are the Superior Court, District Court, Housing Court and Boston Municipal Court. G. L. c. 239, § 2; G. L. c. 185C, § 3; G. L. c. 4, § 7(56)."); Rule 1 of the Uniform Summary Process Rules (2004) ("These rules . . . shall be construed and applied to secure the just, speedy and inexpensive determination of every summary process action.") and Rule 1 of the Uniform Summary Process Rules (2004) Commentary ("Four Departments of the Massachusetts Trial Court have jurisdiction over summary process actions (Superior Court, District Court, Boston Municipal Court and Housing Court)."). During the current pandemic, however, in addition to a moratorium on certain residential evictions, [Note 7] there is a moratorium on jury trials, which would otherwise be available in summary process actions. See Rule 8 of the Uniform Summary Process Rules. According to Saks, "[i]f there were no summary process backlog, we would not be here." Defendant's Response To Plaintiff's Supplemental Brief Concerning Defendant's Motion To Dismiss at 1. 





 BP argues that it has deliberately drafted its complaint so as not to seek possession of the Premises, which would plainly fall outside this court's subject matter jurisdiction, and to seek instead only a declaration that the Lease has been lawfully terminated and a determination as to the Minimum Rent and other charges due both before and after the Lease was terminated. Complaint ¶ 39. It further argues that, even in the absence of a claim for possession, a declaration by this court that the lease has been terminated will have an immediate impact on Saks because: (1) Saks will become a tenant at sufferance, retaining possession only by BP's continuing forbearance from bringing a summary process action, but still responsible for use and occupancy payments; (2) Saks will have no leasehold interest to sublease or assign; (3) Saks will have no leasehold interest to mortgage; (4) Saks will have no right to extend the Lease; and (5) Saks will have not right to encumber BP's title with a recorded notice of lease. Plaintiff's Supplemental Brief In Support Of Its Opposition To Defendant's Motion To Dismiss at 5-6. This court does not find those arguments persuasive. 





 As things currently stand, Saks cannot sublease, mortgage or assign the Lease without BP's consent. See Complaint, Ex. A, Section 6.3, quoted supra. In this Commonwealth, there is no implied obligation on the part of the landlord to act reasonably in withholding consent to an assignment of a commercial lease: a landlord can withhold its consent for any reason or no reason. See 21 Merchants Row Corp. v. Merchants Row, Inc., 412 Mass. 204 , 205-206 (1992). This court sees no reason to treat a tenant's right to mortgage or sublease differently from an assignment. Similarly, the Lease precludes Saks from recording a notice of lease "without the prior approval of Landlord," so BP is not a risk of that happening while Saks's status remains unadjudicated. BP's concern about Saks's right to extend the Lease is also not compelling. Saks just exercised its right to a 15-year extension in 2018, and so will not be required to give notice to BP of its intent to renew until 2030. Complaint, Ex. A at p. 2. Furthermore, the Lease provides that "[t]he exercise by Tenant of an option to extend this Lease pursuant to this Article shall not be deemed to cure any defaults of either party which may then be existing or to operate as a waiver or release of any rights or remedies to which either party may be entitled hereunder." Id. 





 BP is left with the argument that this court has subject matter jurisdiction to determine whether Saks is a tenant at sufferance, responsible for use and occupancy payments, where the Lease has been terminated for non-payment. While it is a close call, this court concludes that it has jurisdiction: a lease is an interest in real estate; whether or not a lease has been terminated is therefore an adjudication of the landlord's and the tenant's interest in real estate, the kind of determination previously made by this court in the option cases described at n. 5, supra; and the court has ancillary jurisdiction over BP's claim for use and occupancy. See Essex Co. v. Goldman, 357 Mass. 427 (1970) (having upheld the validity of a covenant to pay rent for mill power, the Supreme Judicial Court reversed the Land Court's determination that it did not have jurisdiction to render a judgment for rent) (quoting G. L. c. 185, § 1 (k), and stating "[t]his jurisdiction may, in a proper case, include the award of damages. McCarthy v. Lane, 301 Mass. 125 , 130-131. This is such a case."). 





 There is a certain appeal to Saks's argument that, at bottom, this is a contract case focused on the interpretation of lease provisions addressing Saks's rent obligations in the time of a pandemic, a claim that does not implicate the special expertise of the Land Court in matters involving any right, title or interest in land. However, this court is called upon to interpret contracts all the time, for what is a deed, a lease, or a mortgage but a contract? [Note 8] In the end, the court has determined to take jurisdiction over this matter because there is no decisional law to the contrary, there is a ready explanation for why this kind of case has not been brought to this court historically that is unrelated to this court's subject matter jurisdiction (the availability of summary process actions pre-pandemic), and BP may otherwise be deprived of a remedy indefinitely. [Note 9] 





CONCLUSION 





 For the foregoing reasons, the Motion is DENIED. This matter is set down for a Case Management Conference by telephone on February 10, 2021 at 9:30 a.m. 





FOOTNOTES
[Note 1] This compendium is gathered from the allegations of the complaint and the exhibits thereto. See Town of Wrentham v. W. Wrentham Vill., LLC, 451 Mass. 511 , 512 n. 3 (2008) ("In reviewing a motion to dismiss pursuant to Mass. R. Civ. P. 12 (b) (1), 365 Mass. 754 (1974), 'we accept the factual allegations in the plaintiffs' complaint, as well as any favorable inferences reasonably drawn from them, as true.' Sullivan v. Chief Justice for Admin. & Mgt. of the Trial Court, 448 Mass. 15 , 20-21, 858 N.E.2d 699 (2006), quoting Ginther v. Commissioner of Ins., 427 Mass. 319 , 322, 693 N.E.2d 153 (1998)."). Compare Hiles v. Episcopal Diocese of Mass., 437 Mass. 505 , 515-516 (2002) ("Because the defendants moved pursuant to Mass. R. Civ. P. 12 (b) (1) to dismiss the complaint for lack of subject matter jurisdiction, and because their motions were supported by affidavits, the burden fell to Hiles to prove jurisdictional facts. See Williams v. Episcopal Diocese of Mass., 436 Mass. 574 , 577 n.2, 766 N.E.2d 820 (2002); Brown v. Tobyne, 9 Mass. App. Ct. 897 , 898, 402 N.E.2d 1097 (1980). Under this 'factual challenge' to jurisdiction, 'the plaintiff's jurisdictional averments [in the complaint] are entitled to no presumptive weight [and] the court must address the merits of the jurisdictional claim by resolving the factual disputes between the parties.' Valentin v. Hospital Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001)."). 

[Note 2] Amendment No. 1 Of Lease dated as of November 3, 1992 ("First Amendment"), Second Amendment To Lease dated as of May 9, 2003, Third Amendment To Lease dated as of October 5, 2005 ("Third Amendment"), Fourth Amendment To Lease dated as of December 24, 2008, Fifth Amendment To Lease dated as of June 1, 2012, and Sixth Amendment To Lease dated as of December 19, 2016 ("Sixth Amendment"). Complaint ¶ 7. 

[Note 3] This is the conclusion of a number of other courts and commentators that have considered the issue. See, e.g., Schneiker v. Gordon, 732 P.2d 603, 606 (Co. 1987) ("However, as a result of the dual nature of a lease, neither contract principles nor property principles can be exclusively relied upon to govern the resolution of all issues."); Love v. Amsler, 441 N.W.2d 555, 558 (Mn. Ct. App. 1989) ("Minnesota courts have long recognized the dual nature of a lease transaction as sharing characteristics of both a sale or transfer of an interest in land, and a contract."); Incentive Realty, Inc. v. Hawatmeh, 983 S.W.2d 156, 160 (Mo. Ct. App. 1998) ("Missouri courts have recognized the dual nature of a lease as being both a contract and a conveyance."); Signal Mgt. Corp. v. Lamb, 541 N.W.2d 449, 452 (N.D. 1995) ("The dual nature of a lease as both a contract and a conveyance of an interest in land has important implications for resolving disputes between landlords and tenants."); Sunset Fuel & Eng'g Co. v. Compton, 775 P.2d 901, 903 (Or. Ct. App. 1989) ("The Oregon Supreme Court has recognized the dual nature of a lease as both a contract and a conveyance of an estate in land, at least in the context of a tenant abandoning the premises and the obligation of the landlord to mitigate damages."); Thomas W. Merrill & Henry E. Smith, The Property/Contract Interface, 101 Colum. L. Rev. 773, 819 (May 2001) ("A more complex institution that straddles the boundary between contract and property is landlord-tenant law. As in the law of bailments, there is a longstanding debate over whether leases should be classified as a contract or as the conveyance of an estate in land, i.e., a property right."); Lee J. Strang, Damages As The Appropriate Remedy For "Abuse" Of An Easement: Moving Toward Consistency, Efficiency, And Fairness In Property Law, 15 Geo. Mason L. Rev. 933, 944 (June 2008) ("The last one hundred years of development of landlord-tenant law is, in large measure, the substitution of contract doctrine sespecially the dependency of covenantsfor property doctrines."); Edward M. Bloom & Gary D. Buchman, Lease Drafting in Massachusetts § 1.1 (MCLE 2021) ("The subject of leases is complex, due at least in part to the dual nature of a lease. A lease is at once the transfer (or creation) of an estate in real property and a contract between the transferor (called the 'lessor' or 'landlord') and the transferee (called the 'lessee' or 'tenant'), governing the relationship between them, as well as their relationship to the real property in question, for the duration of the estate."). 

[Note 4] See Goodwill Enters. v. Garland, 25 LCR 700 (2017) (Foster, J.) (holding that a bankruptcy trustee's failure to comply with a lease's right of first refusal provision violated that provision and entitled the lessee to specific performance of the same); Theodorou v. Defilippo, 25 LCR 384 (2017) (Long, J.) (holding that lease, including its right of first refusal, was not in effect and, even if it was, the tenant had failed to meet the material terms of the third-party offer); Froio Mgmt. Grp. v. Bargain Disc. Mkts., Inc., 25 LCR 186 (2017) (Foster, J.) (holding that right of first refusal contained in a lease was extinguished once exercised, and declaring that the provision was of no further force or effect). 

[Note 5] See Thayer & Assocs., Inc. v. Davis, 7 LCR 303 (1999) (Green, J.) (tenant sought declaration as to its rights to exercise an option to extend its lease and the landlord counterclaimed for a declaration that the lease had expired and an award of damages, the court holding that the tenant had not properly exercised its option and the lease had expired); Frank & Mildred Andrea Trust v. Dunkin' Donuts, Inc., 7 LCR 341 (1999) (Green, J.) (landlord sought a declaration that a lease had terminated but the court found its claim barred by the doctrine of res judicata and further, having determined that the tenants had timely exercised their option to extend, that the judgment would include a declaration that the lease had been extended through September 4, 2009). 

[Note 6] See, e.g., Curley v. Town of Billerica, 21 LCR 442 (2013) (Foster, J.) (holding (1) that the court had jurisdiction to adjudicate a dispute brought by residents regarding whether the Town violated Article 97 of the Amendments to the Massachusetts Constitution by leasing property held for "playground purposes" for a telecommunications tower without a two-thirds vote of both branches of the legislature and (2) that the lease was not subject to Article 97); Franklin Square Apts., Inc. v. Boston Redevelopment Auth., 14 LCR 236 (2006) (Trombly, J.) (interpreting language of lease to allow tenant to exercise its option to purchase the leasehold estate but to preclude tenant from modifying or terminating the lease once it was both landlord and tenant thereunder); Lepore v. City of Lynn, 13 LCR 237 (Lombardi, J.) (in action by landlord seeking declaration that lease remained in full force and effect, declaring that the parties had entered into a new lease, not an amendment of the old lease, that was void because of the city's failure to comply with the competitive bidding statute, G. L. c. 30B, § 1 et seq.). 

[Note 7] See Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55292 (Sept. 4, 2020) (announcing temporary halt in residential evictions), as extended. 

[Note 8] See Curtis v. Francis, 63 Mass. 427 , 432 (1852) ("The cardinal rule, applicable as well to deeds as to other contracts, is, that the intent of the parties, as derived from the deed itself, is to govern the construction, if that intent be consistent with the rules of law."); Lipton Professional Soccer, Inc. v. Bay State Harness Horse Racing & Breeding Ass'n., 8 Mass. App. Ct. 458 , 462 (1979) (interpreting a commercial lease) ("As the resolution of this issue involves the interpretation of a contractual document we are to be guided by the rule stated in Dittemore v. Dickey, 249 Mass. 95 , 104-105 (1924): 'Every instrument in writing is to be interpreted, with a view to the material circumstances of the parties at the time of the execution, in the light of the pertinent facts within their knowledge and in such manner as to give effect to the main end designed to be accomplished.'"); James B. Nutter & Co. v. Estate of Murphy, 478 Mass. 664 , 669 (2018) (whether a reverse mortgage incorporates the statutory power of sale "is a matter of contract interpretation, to which we apply the traditional principles of contract law."). 

[Note 9] Even with this decision, BP may still remain in limbo: Saks has expressed its intent to avail itself of G. L. c. 185, § 15, governing the framing of questions for trial by jury in the Superior Court. 


 
 Home/Search 
 Land Cases by Docket Number
 Land Cases by Date 
 Land Cases by Name
 


 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.